IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

v.                    CRIMINAL NO. 05-26 ERIE

GEORGE L. EBERLE
ALESHA M. EBERLE



HEARING ON PRETRIAL MOTIONS



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, March 7, 2006.


APPEARANCES:
       CHRISTIAN A. TRABOLD, Assistant United States
       Attorney, appearing on behalf of the Government.

       THOMAS W. PATTON, Assistant Federal Public

Defender, appearing on behalf of Defendant
George Eberle.

MICHAEL R. HADLEY, Esquire, appearing on behalf
of Defendant Alesha Eberle.

Ronald J. Bench, RMR - Official Court Reporter

2

1           I N D E X

2

    WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS

3

  FOR THE GOVERNMENT:

4

  JESSICA LYNN

5     By Mr. Trabold -        5     --      94      --

      By Mr. Patton -         --     36      --      99

6     By Mr. Hadley -         --     83      --     103

7                  - - -

8  FOR THE DEFENSE:

9  CRAIG CULHANE

      By Mr. Patton -        109     --     120      --

10     By Mr. Trabold -       --    118      --      --

11  WILLIAM NIEDER

      By Mr. Patton -        121     --      --      --

12     By Mr. Trabold -       --    124      --      --

      By Mr. Hadley -         --    127      --      --

13

  MARK GANLEY

| | | | | | |
|---|---|---|---|---|---|
| 14 | By Mr. Patton - | 127 | -- | -- | -- |
| | By Mr. Hadley - | -- | 141 | -- | -- |
| 15 | By Mr. Trabold - | -- | 143 | -- | -- |

16  IAN CHISHOLM

| | | | | | |
|---|---|---|---|---|---|
| | By Mr. Patton - | 149 | -- | 158 | -- |
| 17 | By Mr. Trabold - | -- | 156 | -- | -- |

18

                    - - -

19

20    EXHIBITS:              IDENTIFIED    ADMITTED

21   Defendant's Exhibit A          57        182

22   Defendant's Exhibit B          72        182

23   Defendant's Exhibit D          114        182

24

25                    - - -


                                3


1           P R O C E E D I N G S

2

3           (Whereupon, the proceedings began at 9:05 a.m., on

4    Tuesday, March 7, 2006, in Courtroom C.)

5

6           THE COURT:  This is the time we set for hearing

7    argument on the defendants' motion to suppress.  The

8  defendants' motion to sever for trial at Counts Three and Four.

9  And defendant Alesha Eberle's motion in limine.  Did I miss

10  anything?

11         MR. PATTON:  I don't believe so, your Honor.  I

12  would like to clarify on the record that we had filed

13  additional pretrial motions that dealt with Counts One and Two

14  of the indictment.  But I have been informed, along with the

15  court, by Mr. Trabold that the United States is going to

16  dismiss Counts One and Two, mooting out the pretrial motion we

17  had filed with regards to Counts One and Two.

18         THE COURT:  I think that is an appropriate

19  clarification.  Maybe you would want to do that for the record

20  right now?

21         MR. TRABOLD:  If the court wants me to file a

22  written motion, but I certainly can do it on the record.

23         THE COURT:  Oral is fine right now.

24         MR. TRABOLD:  For the reasons we discussed in

25  chambers I believe last Thursday, primarily that the victim in

4

1  this case, Tiffany Smith, now says that the pictures that form

2    the basis for Counts One and Two of the indictment, she says

3    those pictures are not of her.  The government would move to

4    dismiss Counts One and Two of the indictment.  Which leaves

5    just Counts Three and Four for our purposes here today.

6          THE COURT:  All right, then those counts are

7    dismissed.  Are we ready to go?

8          MR. TRABOLD:  Yes, your Honor.

9          THE COURT:  All right, let's go.

10          MR. TRABOLD:  Your Honor, if I could just put one

11    thing on the record before we call our witness.  Typically,

12    obviously in a search warrant type setting, the four corners of

13    the warrant are what controls.  I think this essentially

14    amounts to counsel requesting a Franks hearing in this case.
                     ———

15    But based on what I know about the case, it appears to me a

16    Franks hearing is appropriate, based on what counsel are
        ———

17    claiming are the claimed defects in the warrant.

18          THE COURT:  I view the suppression aspect as likely

19    generating a Franks hearing, that's really what you're asking
                 ———

20    for, isn't it?

21          MR. PATTON:  Yes, sir.

22    THE COURT:  That's what we're going to have then.

23    MR. TRABOLD:  Thank you.  The government calls

24  county detective Jessica Lynn.

25    THE COURT:  Come over here, my clerk will swear you

5

1  in.

2    JESSICA LYNN, GOVERNMENT WITNESS, SWORN

3    DIRECT EXAMINATION

4  BY MR. TRABOLD:

5  Q.   Ma'am, where are you employed -- where do you work,

6  ma'am?

7  A.   The Erie County District Attorney's office.

8  Q.   In what capacity?

9  A.   As an Erie County detective.

10  Q.   How long have you been a county detective?

11  A.   For over three years.

12  Q.   Prior to becoming a county detective, did you work in

13  some capacity at the Erie County DA's office prior to

14  officially being a county detective?

15  A.   Yes, I was their intern for the summer of 2001, and then

16  I was hired as an assistant county detective up until the time

17  when I was hired as a full-time county detective.

18  Q.    And are you assigned to investigate a particular class of

19  cases now as a county detective?

20  A.    Yes, I am.

21  Q.    Can you explain what that class of cases is to the judge,

22  please?

23  A.    Sure.  I'm employed to investigate child abuse and high

24  tech computer crime investigations.  I also incorporate those

25  two together to investigate Internet crimes against children

6

1  investigations.

2  Q.    And would it be accurate to say that along those lines

3  you've received training in computer investigations and also in

4  child exploitation?

5  A.    Yes, I have.

6  Q.    First, with regard to computer training, what is the

7  nature, just in general terms, of the computer training that

8  you received?

9  A.    Well, I'm a trained computer forensic examiner.  I am

10  able to forensically examine electronic media storage devices

11  to find information that may be on them.

12  Q.    And what is your educational background?

13  A.    I received a bachelor's degree from Edinboro University

14  in criminal justice.

15  Q.    Okay.  Approximately, how many hours of training would

16  you say you received in what I'll generally call computer

17  forensics?

18  A.    I'd say about 300, close to 300.

19  Q.    And those would be along the lines of training seminars

20  that you've attended while employed at the DA's office?

21  A.    Seminars and hands-on.

22  Q.    I'm sorry, I didn't hear what you said?

23  A.    And hands-on in the classes.

24  Q.    Okay.  Now, with regard to child exploitation, how many

25  hours of training would you say you received in that regard,

7

1  approximately?

2  A.    I'd say close to a hundred hours.

3  Q.    And day-to-day your cases typically involve child

4  exploitation?

5  A.   Yes.

6  Q.   And how many cases have you charged where you've been the

7  affiant in a child exploitation related crime?

8  A.   I believe six.

9  Q.   And separate and apart from the cases where you've been

10  the affiant, how many computers have you done a forensic exam

11  on relative to child exploitation cases, approximately?

12  A.   Just child exploitation, I would have to say close to 30.

13  Q.   Have you done forensic exams in computer cases unrelated

14  to child exploitation?

15  A.   Yes, I have.

16  Q.   And those would be any and all types of crimes, white

17  collar, perhaps even some violent crime?

18  A.   Yes, harassment, credit card, identity theft.

19  Q.   And have you also been the affiant on search warrants for

20  computers relative to your investigations?

21  A.   Yes, I have.

22  Q.   Approximately, how many times?

23  A.   Definitely the six that I've charged.

24  Q.   Separate and apart from arrests or anything like that,

25  are you currently working on what I'll term online

8

1  investigations?

2  A.   Yes.

3  Q.   Explain to the judge what you mean by online

4  investigations?

5  A.   Sure.  As part of Internet crimes against children, we do

6  what are called proactive and reactive investigations.  A

7  proactive investigation is when the officer poses online in a

8  chat room or instant messaging in a chat room.  They also pose

9  online, which I have done, as a parent of a child, too.  The

10  reactive part of the investigation is when we currently or

11  actively investigate with another police department or the

12  National Center for Missing and Exploited Children has sent to

13  us a report.

14  Q.   So proactive is you online in an undercover capacity

15  interacting with people who may be attempting to or are engaged

16  in child exploitation?

17  A.   Yes, I pose as a 13-year-old, a 14-year-old and a

18  35-year-old female, who is the mother of my 13-year-old person.

19  Q.   And the reactive investigations are a police department

20   in Houston sends you information, hey, we think we have

21   somebody in Erie that you need to look at?

22   A.   Yes, that's what's called Cybertips, which comes from the

23   National Center for Missing and Exploited Children.

24   Q.   Now, as part of not only your training but also your

25   experience, have you become familiar with what I'll term

9

1   collector characteristics for people that collect or keep child

2   pornography?

3   A.   Yes.

4   Q.   And would you characterize this as well-known within the

5   child exploitation investigative community that people who are

6   interested in child pornography typically keep the material?

7   A.   Oh, yes.

8   Q.   And do they keep it for an extended period of time or

9   very briefly?

10   A.   Extended periods of time.

11   Q.   And there are a number of reasons why folks interested in

12   child pornography might keep it for a lengthy period of time?

13   A.   Yes.

14  Q.    And one of those reasons is -- well, let me phrase it

15  this way.  In your experience is it your understanding that

16  people interested in child pornography often have a specific

17  age range that they're interested in?

18  A.    Yes, they have a special preference.

19  Q.    Just by way of example, defendant X might be interested

20  in 10-year-old boys?

21  A.    Correct.

22  Q.    And then somebody else that you encounter might be

23  interested in 14-year-old girls?

24  A.    Yes.

25  Q.    And that is most typically the case, that people have a

10

1  focused interest range?

2  A.    Most of the time.

3  Q.    In your experience and in your training, is it your

4  understanding that these individuals will often trade the

5  pictures of child pornography that they have?

6       MR. HADLEY:  Objection, your Honor, I know we don't

7  have a jury here, but he is really leading his own witness

8  through this, I'd like to hear it from her.

9         THE COURT:  Overruled.

10  BY MR. TRABOLD:

11  Q.   Is it your understanding that people interested in this

12  type of material often trade with other people?

13  A.   Yes, they'll collect their special preference, but

14  they'll also collect other pictures in order to be able to

15  trade with other people that they might be communicating with

16  in order to get the rest of their collection.

17  Q.   So if I'm interested in 14-year-olds, I might keep some

18  pictures of 10-year-olds so I can trade and get pictures of

19  14-year-olds?

20  A.   Yes.

21  Q.   Is it your experience that individuals interested in this

22  type of material develop an emotional tie to the images?

23  A.   Yes, a majority of the time they use them for sexual

24  gratification.

25  Q.   Because of that emotional tie, does that tie into them

11

1  wanting to keep the images for a lengthy period of time?

2  A.    Yes.

3  Q.    Now, is it your experience or do you know this from your

4  training, do individuals that have this type of material

5  sometimes show it to minors?

6  A.    Yes.

7  Q.    Why do they do that?

8  A.    To lower inhibitions of children.

9  Q.    What is their purpose in lowering children's inhibitions?

10  A.    To let them know that other kids do this and that it's

11  okay.

12  Q.    Now, would you characterize the availability -- or let me

13  rephrase that.  In your experience and based on what you know

14  from your training, is it easy to obtain child pornography from

15  the Internet?

16  A.    No.

17  Q.    What I mean by that, is it your experience or do you have

18  specific information to share that persons interested in child

19  pornography, do they just go to Google and type in child

20  pornography and up it comes?

21  A.    No, it does not come up when you type that in.

22  Q.    What is your experience with how the typical seeker of

23  child pornography obtains it from the Internet?

24  A.   It's usually, a lot of times it will be in an underground

25  chat room, where they'll be able to communicate with other


12


1  people like -- as if they're collector items.  Also, there are

2  a lot of code terms that you have to use in order to find the

3  pictures.  People who are familiar with this type of stuff,

4  such as child pornography, usually know those terms.  One of

5  the big key search terms are child models, Lollita, stuff like

6  that.  But just to type children pornography, you won't find

7  it, you have to actively search for these.

8  Q.   And is it your experience that your typical user on the

9  Internet who's not interested in child pornography, are those

10  folks typically, do they typically encounter or are they

11  bombarded with child pornography on their computer that they

12  did not seek out?

13  A.   No.

14  Q.   Now, are there potential pitfalls or difficulties for the

15  individual that's interested in getting child pornography onto

16  their computer; what types of things might they encounter that

17  make it difficult to obtain the material?

18  A.    They always run the risk of communicating with a police

19  officer, there's a lot of us who are doing the proactive

20  investigations.  They also run the risk of searching and

21  finding the pictures and having the search engine, such as

22  Yahoo and AOL, monitoring every move.

23  Q.    Is there a risk they may be trying to seek out this

24  information and then place evidence that's detrimental to them

25  on their computer?


13


1  A.    Yes.

2  Q.    Is it your experience that individuals interested in this

3  type of material are often interested in instant gratification?

4  A.    Yes.

5  Q.    And what do you mean by that, what is the aspect of

6  instant gratification as it relates to these types of pictures?

7  A.    When they want to look at the picture, they want to look

8  at it right then and there, they're not going to take the time

9  to go search the Internet, use code terms or take the risk of

10  entering a chat room to trade with someone.

11  Q.    Now, is the typical collector -- can you characterize it,

12  is it in some ways like collecting other things?

13  A.    Yes, I have actually had the defendants tell me that it's

14  like collecting baseball cards, it's their prize collection.

15  Q.    What do they mean by that, what do you take them to mean

16  when they say it's like collecting baseball cards?

17  A.    That they may have a favorite team as a baseball card,

18  they have a favorite sexual preference.  Have it be children

19  under five or boys under 10-years-old.  They will use that and

20  then trade the other pictures that they get with other people

21  to help complete their collection.  Such as keeping baseball

22  cards for a particular team and trading other team members to

23  get that.

24  Q.    Is that part of what leads you to the conclusion that

25  this type of material is kept for a length of time?


14


1  A.    Yes.

2  Q.    Now, I want to turn your focus to the case we're here on

3  today, the case involving George and Alesha Eberle.  How did

4  you first become involved in this case?

5  A.    I received a referral, a reactive investigation from

6  Delaware County, Pennsylvania.

7  Q.    And what was the nature of that referral and when --

8  first of all, when did you receive that referral?

9  A.    I believe it was August of '04.

10  Q.    Okay.  Late August, beginning or sometime in August?

11  A.    I would have to look at my report to make sure.

12  Q.    Well, you get a referral from them in August of '04, what

13  is the nature of the referral?

14  A.    It's what's called a Cybertip from the National Center

15  for Missing and Exploited Children.

16  Q.    What does the Cybertip say, in general terms?

17  A.    That a particular user uploaded images suspected to be

18  child pornography to a Yahoo photo album account.

19  Q.    And with these Cybertips, is the information typically

20  reported by the Internet service provider to the National

21  Center for Missing and Exploited children?

22  A.    Yes, the service providers monitor the e-mails, anything

23  posted to accounts.  And then if they find anything that is

24  suspected to be contraband, they notify the National Center for

25  Missing and Exploited Children.

1   Q.   And that's what happened in this case?

2   A.   Yes.

3   Q.   You then receive information from the Delaware County

4   Child Exploitation Task Force?

5   A.   Yes, they're actually the grant holder for the Internet

6   Crimes Against Children Task Force in Pennsylvania.  They get

7   all the Cybertips, then they do the court orders to find out

8   the location of the suspect.  And then they send it to that

9   agency.

10  Q.   So in Pennsylvania whenever there is a Cybertip coming

11  from NCMEC, they all go to Delaware County then they're

12  distributed from there?

13  A.   Yes.

14  Q.   And does Delaware County, once they receive the tip,

15  conduct any investigation to see if they can pin down who the

16  person is that is the subject of the pictures?

17  A.   They generally do a court order.

18  Q.   Was that done in this case?

19  A.   Yes.

20  Q.   Was that information provided to you?

21  A.   Yes.

22  Q.   Did you follow-up on that information?

23  A.   Yes, I did.

24  Q.   What steps did you take?

25  A.   I reviewed the information and found that the Yahoo photo

16

1  album that the pictures were uploaded to came back to a

2  George E., and had a zip code and date of birth.  And the zip

3  code back to Corry.

4  Q.   Based on that information to George E. in Corry, did you

5  follow up with the Corry Police Department?

6  A.   Yes, I did.

7  Q.   Based on your investigation with them, were you able to

8  come to a determination as to who this George E. that was the

9  subject of the Cybertip was?

10  A.   Yes, the Yahoo screen name was glepa, g-l-e-p-a, 2001.

11  And it came through determination through the investigation

12  that glepa was George Eberle.

13  Q.   And once you knew glepa was George Eberle, how did you

14  further the investigation from there?

15  A.   I contacted the Office of Children and Youth and found

16  that they did have an OCY worker going to their house, and I

17  spoke with her in regards to computers.

18  Q.   And what did that OCY worker tell you with regard to

19  George Eberle's possession of a computer?

20  A.   The first time I spoke with her, she said that they did

21  have a computer and a web cam in their home.

22  Q.   Did you inquire at that point in time with regard to

23  whether they had a computer back in 2001 or were you just

24  looking to try and obtain the computer that was currently there

25  in 2004?


                                17


1  A.   Yes, I was looking for a computer, given the fact that

2  people who possess child pornography, in this case this

3  particular individual uploaded, which means they put onto this

4  Yahoo account images of suspected child pornography.  It's

5  typically kept.

6  Q.   Just so the record is clear, though, the information that

7  you received from the Cybertip, which you ultimately

8  investigated, you make the determination that George Eberle

9   uploaded the pictures that are the subject of the Cybertip onto

10  his Yahoo account?

11  A.   Yes.

12  Q.   And, again, just so the record is clear, what would the

13  pictures that are on a person's Yahoo account, just in general

14  terms, would those pictures, are they kept on the individual's

15  computer hard drive or are they kept on Yahoo's computer

16  equipment?

17  A.   It could be both.  They could store it on the server in

18  Yahoo, in this case it was in their photo album, which was on

19  Yahoo.  But also they could save pictures in their My Documents

20  folder on their computer.

21  Q.   And would you, as a computer investigator, would you

22  expect to find, if it was still the computer used to upload the

23  pictures to Yahoo, would you expect to find evidence of that

24  upload on the computer?

25  A.   Yes.


18


1   Q.   Now, do you do anything -- once you learn that the

2   Eberles have a computer and they use a computer from the OCY

3  worker, what steps do you take beyond that?

4  A.    Well, I went and drafted a search warrant to obtain that

5  computer.  And then when I spoke with the OCY worker again, I

6  believe it was a couple weeks later, but I'd have to double

7  check the report, it turned out that the computer was no longer

8  there.

9  Q.    And did you then investigate the circumstances of why the

10  computer wasn't there?

11  A.    Yes.  She told me that she spoke with Mr. Eberle and

12  found that the computer had been taken by the place he rented

13  it from for lack of payment.

14  Q.    Did you then change your search warrant in any way?

15  A.    Yes, I immediately called the rental company, which I

16  believe was House of Television in Corry, and asked to find out

17  where that computer was.  They told me that it was already

18  wiped by the system software and re-rented for approximately a

19  month.

20  Q.    Okay.  Just so the record can be as clear as possible and

21  the judge can be clear.  When the House of Television told you

22  that the computer had been wiped, as a computer person, what

23  did you take that to mean?

24  A.    That the information that would be easily accessible to

25  users, such as the items under My Documents or anything that

19

1  you can easily access, would no longer be available, it would

2  be in what's called unallocated space.  Essentially, it was

3  deleted.

4  Q.    Okay, just so again we can be clear.  Is this typical in

5  the computer rental business?

6  A.    Yes.

7  Q.    Why?

8  A.    So someone has a clean computer.  A new user would be

9  able to have their own preferences on there.

10  Q.    Let's say person A rents their computer, their rental

11  period is done, they return the computer back to the rental

12  place.  If it's wiped and then re-rented to person B, can

13  person B access person A's information?

14  A.    No.

15  Q.    The reason for that is because it's in unallocated space

16  if there's any information left?

17  A.    Right, unless they were a forensic examiner and had the

18  special software.

19  Q.   The special software allows you to delve into areas of a

20  person's computer hard drive that the typical user could not

21  get to?

22  A.   That's correct.

23  Q.   And just so we can be as clear as possible, those would

24  typically be the areas where deleted items are kept on the

25  computer?

20

1  A.   Yes.

2  Q.   So the House of Television tells you the computer is

3  wiped and had been re-rented.  Do they tell you for how long a

4  period of time the computer had been in the possession of the

5  new renter?

6  A.   I would have to check my report, but I'm pretty sure it

7  was August 20th.

8        THE COURT:  Of what year?

9        THE WITNESS:  2004, sir.

10  BY MR. TRABOLD:

11  Q.   And so for a period of weeks the computer was already in

12  the new user's possession?

13  A.    Yes.

14  Q.    And then based on the information provided by the House

15  of Television, you then give to them a search warrant for the

16  computer?

17  A.    Yes.

18  Q.    Does the House of Television have the computer you want

19  immediately available for you?

20  A.    No, they have to go take it from the other user.

21  Q.    Now, before we get into what you found if anything on the

22  computer, does the wiping of the computer reduce, potentially

23  anyways, reduce its evidentiary value to you?

24  A.    Yes.

25  Q.    Why?


21


1  A.    Because if the Eberles had used the computer, if

2  everything would be in unallocated space, it would be very hard

3  to determine if there was an image on there, who actually put

4  the image there.

5  Q.    Now, does the re-renting of the computer reduce its

6   evidentiary value?

7   A.   Yes.

8   Q.   Again, explain why?

9   A.   Because it's now in someone else's possession and any

10  item that they use, such as a document or a picture and they

11  delete, will also be in unallocated space.  Once something goes

12  in unallocated space, it takes away the date and time stamp

13  that's put on there by the hard drive.  So you no longer have

14  the time to match it up to the user.

15  Q.   So you are now faced with executing a search warrant in

16  this first search on a computer that may have a significantly

17  reduced evidentiary value for you?

18  A.   That is correct.

19  Q.   Now, you get the computer, do you perform a forensic exam

20  on the computer?

21  A.   Yes, I do.

22  Q.   Do you find anything of evidentiary value on the

23  computer?

24  A.   Absolutely not.

25  Q.   And let's take that and do a few steps.  Do you find

22

1   child pornography on the computer?

2   A.   No.

3   Q.   Do you find anything in any way linking that computer to

4   these two defendants?

5   A.   No, I did not.

6   Q.   Did you find anything -- were there items on the computer

7   that had nothing to do with them but which you were able to

8   easily locate?

9   A.   Yes, there was documents from the new user.  Pictures

10  from the new user.

11  Q.    And when you got the computer, had the House of

12  Television attempted to wipe it again so the information from

13  the second renter wasn't on there, was that readily apparent?

14  A.    No, they didn't wipe it again.

15  Q.   I just want to make sure we're clear on the record with

16  this.  You get the computer from them.  When you do your exam,

17  are there, let's say, items on the new user's desktop that you

18  are able to easily take a look at?

19  A.    Yes.

20  Q.   Were there items on the computer that were not in

21  unallocated space that you could easily see?

22  A.    Yes, but I was searching for unallocated space.

23  Q.    And nothing whatsoever was found relative to the Eberles?

24  A.    No, I did a search term for Eberle, for George and

25  Alesha, for the screen name glepa2001, and I knew from the

23

1  Office of Children and Youth worker that they had a web cam.

2  So I assumed that they would have taken pictures of their

3  children or them.  I did have a copy of George's and Alesha's

4  IDs, through the use of JNET, driver's licenses and state IDs,

5  I did not find any picture whatsoever matching to the Eberles.

6  Nor did I find any information when I ran a search for their

7  names.

8  Q.    Did you run what's known as a hash value check for the

9  pictures of the child pornography that you received from the

10  Cybertip?

11  A.    Yes, I did.

12  Q.    And can you explain to the judge what is a hash value --

13  I might not even be using the right term, but when you check a

14  hash value, what does that even mean?

15  A.    Every picture has what's called a MD5 hash, which

16  essentially in layman's terms is like a fingerprint for a

17  photograph or an image.  All of the images that were uploaded

18  to the glepa2001 Yahoo account had a MD5 hash attached.  That

19  came from the National Center for Missing and Exploited

20  Children.  I ran those particular numbers, that hash value,

21  that MD5 hash on the rented computer and I did not find a

22  match.

23  Q.    This hash check, is that the typical way that known

24  photographs are discovered or compared?

25  A.    No, I usually don't run MD5 hashes.  It was just a last

24

1  chance for this computer.

2  Q.    And even that last chance was fruitless?

3  A.    Yes.

4  Q.    Now, what if anything did this lead you to believe, once

5  you finish your forensic exam, you don't find anything, what

6  conclusion do you arrive at at that point?

7  A.    I honestly believed that this was not the computer the

8  Eberles used.

9  Q.    And why did you believe that?

file:///A|/EBERLESP.TXT

10  A.    Because there was absolutely no evidence whatsoever

11  relating to the Eberles ever using this computer.

12        THE COURT:  I didn't hear that last part?

13        THE WITNESS:  I'm sorry, there was absolutely no

14  evidence linking the Eberles to actually using this computer.

15  BY MR. TRABOLD:

16  Q.    In your experience did you expect, before you did the

17  exam, to be able to extract information relative to the

18  Eberles?

19  A.    I would have expected to at least find a photo, if they

20  had taken a photo.

21  Q.    You would have probably found this in the unallocated

22  space?

23  A.    Correct.

24  Q.    Now, you have the conclusion that this probably isn't

25  even the computer that the Eberles had rented.  Did you go back


                                  25


1  to the House of Television to inquire further or to further the

2  investigation relative to this first search warrant?

3  A.    No, I did not.

4  Q.  Why not?

5  A.  I had other cases to work on.  I did not want to go on a

6  fishing expedition to find the correct computer.

7  Q.  You didn't have anything to really go on with this?

8  A.  Absolutely not.

9  Q.  Did you have any expectation that if you had gone back to

10  the House of Television, they would have been able to catch up

11  to the right computer?

12  A.  No.

13  Q.  Because they hadn't even given you the computer you

14  thought was right in the first place?

15  A.  I didn't believe it was the correct one.

16  Q.  Now, with that, the case lies dormant for a period of

17  time?

18  A.  Yes.

19  Q.  Primarily because you don't have any evidence of

20  anything?

21  A.  Correct.

22  Q.  And at this point in time when you determine there's

23  nothing on this computer that is of usefulness to you,

24  approximately how many other open cases or investigations or

25  things that are on your plate that you need to look at do you

26

1  have?

2  A.   I couldn't even tell you a number.

3  Q.   But more than a half a dozen?

4  A.   Yes.

5  Q.   Are you at this same time engaging in these undercover

6  investigations?

7  A.   Not at that time.  But I also worked with the child abuse

8  unit and investigate sexual and physical abuse as to other

9  computer crimes and other work in the District Attorney's

10  office, this was not my sole case.

11  Q.   So, in short, at this point in time you have enough cases

12  with evidence that you can work on?

13  A.   That's correct.

14  Q.   Now, the case lies dormant for a period of time and then

15  in March of 2005 something else occurs which causes you to

16  become back involved in this investigation?

17  A.   Yes.

18  Q.   And what is that?

19  A.   I get a phone call from the Corry Police Department.

20  They have a victim stating that she was molested and raped by

21  the Eberles and also photographs were taken of her during that

22  time.

23  Q.   And at the time you investigated the first half of your

24  investigation with the computer, you received from NCMEC and

25  Delaware County a series of pictures of a young girl?


27


1  A.   Yes.

2  Q.   By young I mean --

3  A.   Eleven or 12.

4  Q.   In those pictures is the young girl naked in some of the

5  pictures?

6  A.   Yes.

7  Q.   Is the girl engaging in sexually explicit conduct in at

8  least some of the pictures?

9  A.   Some of the pictures.

10  Q.   And at the time you did that investigation, the child

11  that's depicted in the series of pictures that you received,

12  which were on Mr. Eberle's Yahoo account, that child was

13   unknown?

14   A.   It was unknown, yes.

15   Q.   So now in March of '05, you get information from a minor

16   female that she's been assaulted by the Eberles?

17   A.   Yes.

18   Q.   And pictures taken?

19   A.   Yes.

20   Q.   What do you then do to follow-up this investigation?

21   A.   Well, she said that this happened a couple years prior to

22   the time that we got the phone call, which was March of 2005.

23   So to put it in the approximate timeframe of the original

24   photos being uploaded to Yahoo.  So we have the victim come

25   into the Children's Advocacy Center to have a forensic

28

1   interview.

2   Q.   When you say a forensic interview, what is your

3   understanding of what that means?

4   A.   It's a trained professional will speak with the victim.

5   Q.   What is the training designed to do or to prevent?

6   A.   To prevent any type of leading or any type of bias

7    questions.

8    Q.    And so the victim that reported to the Corry Police

9    Department the assault by these two defendants is forensically

10    interviewed?

11    A.    Yes.

12    Q.    Do you participate in that interview or at least witness

13    it?

14    A.    I witnessed it.

15    Q.    Explain, just so the judge is clear, what are the

16    surroundings or the circumstances of how you would witness an

17    interview without taking part in it?

18    A.    Sure.  There's a room with two chairs.  One's a sofa,

19    one's a chair, sitting across from each other, the forensic

20    interviewer will sit in one and the child will sit in the

21    other.  There's an observation room with a one-way mirror.  I'm

22    sorry, a two-way mirror, I'm sorry.  Then we sit in the other

23    room so we can watch the interview going on.  There's also a

24    videotape and a microphone that we can hear.

25    Q.    So you can be in one room watching the whole interview?

29

1  A.   Yes.

2  Q.   Is the interview videotaped or recorded?

3  A.   Yes.

4  Q.   And without going into the lengthy sum and substance of

5  the interview, does the victim, when forensically interviewed

6  at the Children's Advocacy Center, implicate these two

7  defendants in an assault on her?

8  A.   Yes.

9  Q.   And separate and apart from the assault, at some point

10  during the interview is the victim shown the pictures that came

11  from the Cybertip line?

12  A.   Not during the interview.

13  Q.   At some point subsequent to the interview?

14  A.   Yes, she talked in the interview about having pictures

15  taken of her and that the Eberles showed them to her on their

16  computer.  After the interview was done, because that interview

17  was pretty much solely for the rape and molestation

18  allegations, my partner and I went into speak with her

19  separately in regards to the allegations of photographs.

20  Q.   And the portion that relates to the photographs, was that

21  videotaped?

22  A.   No, it was not.

23  Q.   Why?

24  A.   Don't know the answer, I don't know.

25  Q.   So the videotaped portion of the interview concludes, was

30

1  there something that she said during the course of the

2  interview that caused you to go get the photographs and show

3  them to her?

4  A.   Yes.

5  Q.   What happens when you show the victim this series of

6  photographs?

7  A.   Well, I spoke with her before I showed them to her.  I

8  asked her, typically, 11 and 12-year-olds usually have a

9  favorite color or a favorite outfit or piece of jewelry that

10  they usually wear.  I asked her if there was anything in

11  particular at that age that she always had on.  And she said

12  that she always wore a necklace with a pendent and she always

13  wore a silver ring on her left hand.

14  Q.   Is the girl that's depicted in those series of photos, is

15  it apparent that she has items of jewelry on?

16  A.   Yes, the girl is wearing a necklace with a pendent and a

17    silver ring on her left hand.

18    Q.    So beyond just saying that she was assaulted and that

19    pictures were taken of her, she provides some further

20    description of the way she looked when this incident occurred?

21    A.    Yes, without even looking at the images.

22    Q.    She talked about the jewelry items before you ever showed

23    her the images?

24    A.    Yes.

25    Q.    With that then do you show the victim the series of

31

1    images that come from the Cybertip?

2    A.    Yes, I did.

3    Q.    What if anything does she say and how does she react?

4    A.    Her reaction was immediate that that was her, those are

5    pictures that they took of her.  She said that was my pendent.

6    Q.    Beyond the jewelry, does she say anything else about any

7    item of clothing or underwear that she might have had on?

8    A.    She said it looked like the bra that she had.

9    Q.    What was her demeanor like when she revealed this

10    information?

11  A.    She was very shook up, very scared, was her immediate

12  reaction, teared up, starting crying.

13  Q.    And at the time you interviewed Tiffany Smith, the

14  victim, and the forensic interview occurred, how old,

15  approximately, would she have been?

16  A.    During the interview?

17  Q.    Yes, when you interviewed her?

18  A.    Fourteen or fifteen.

19  Q.    And the assault would have occurred when she was 12 or

20  13?

21  A.    Roughly, yes.

22  Q.    Now, separate and apart from that information being

23  provided to you from the victim, does the victim also indicate

24  that she engaged in a three-way conversation with these

25  defendants?

32

1  A.    Yes.

2  Q.    And did that occur in March of '05?

3  A.    Yes.

4  Q.    And what does she say about -- explain to the judge the

5   circumstances of this three-way conversation?

6   A.   The three-way conversation consisted of -- in a previous

7   allegation of the rape and the molestation, Tiffany said that

8   the Eberles videotaped it.  And in addition to that, the

9   pictures that were, she claimed were taken of her.  The

10  three-way conversation discussed doing that again, taking

11  another videotape of a three-way between them.

12  Q.   Let's take this one step at a time.  Does the victim

13  indicate that she informed her mother of the assault?

14  A.   Yes.

15  Q.   And how does she characterize her mother's reaction?

16  A.   Her mother didn't believe her.

17  Q.   Okay.  And based on her mother's reaction, does she say

18  anything to her mother?

19  A.   Yes, she says I'm going to prove it to you.

20  Q.   How does she do that?

21  A.   She does a three-way call.

22  Q.   Between who?

23  A.   Between her mother and Alesha.

24  Q.   The phone call is set up by who?

25  A.   By Tiffany.

33

1  Q.    The victim sets up the phone call, she calls Alesha

2  Eberle, one of the defendants?

3  A.    From what she said, yes.

4  Q.    And, again, this is information that you received from

5  the victim?

6  A.    Correct.

7  Q.    And the victim says she called Alesha Eberle, and is

8  anyone else on the phone?

9  A.    Her mom.

10  Q.    And is her mom on the phone in a circumstance where

11  Alesha would have known her mom was on the phone?

12  A.    Tiffany said Alesha did not know.

13  Q.    And what did they discuss while mom is listening in on

14  the phone call?

15  A.    The videotape that had occurred a couple years ago.

16  Q.    What if anything does the victim reveal about what Ms.

17  Eberle said during the course of that phone call?

18  A.    That the videotape was destroyed somehow, they wanted to

19  make another one.

20  Q.   They wanted to make another one, meaning who?

21  A.   The Eberles, with Tiffany.

22  Q.   George and Alesha indicated on the phone call they wanted

23  to make another video with the victim?

24  A.   According to the victim, yes.

25  Q.   Does the victim indicate that Mr. Eberle gets on the

34

1  phone?

2  A.   Yes.

3  Q.   What if anything does the victim say Mr. Eberle said

4  during the course of the phone call?

5  A.   I don't remember that.  I just remember she said that

6  George did get on.

7  Q.   Now, after this forensic interview occurs and then you

8  discuss these photographs with the victim that are the subject

9  of the Cybertip, what do you then do, if anything, with regard

10  to this investigation?

11  A.   Well, she said that there was a current computer and a

12  web cam at their house.

13  Q.   Did she reveal how she knew that?

14    A.    She was there.

15    Q.    And at that point in time were you aware that the victim

16    and Mrs. Eberle had been in Internet contact?

17    A.    At that time, no.

18    Q.    So based on her information that they had a computer in

19    their residence at the time of the forensic interview, what if

20    anything do you do?

21    A.    We draft a search warrant.

22    Q.    What were you seeking to find in the search warrant?

23    A.    Any and all portable media, storage devices, such as

24    USB's, floppies, CD's, portable hard drives, computer, web cam,

25    digital cameras and other videotapes.


                                    35


1    Q.    Now, with this second search warrant, you were seeking

2    the computer and all of these other media that you just

3    described?

4    A.    Yes.

5    Q.    With the first search warrant, were you just seeking the

6    computer?

7    A.    Yes.

8   Q.    Why in the second search warrant would you seek media or

9   storage devices beyond just their computer?

10   A.    When Tiffany said that there was another web cam there, I

11   definitely wanted to grab the computer for that part.  She also

12   said that it was videotaped on VHS.  So I wanted to look for

13   the VHS.  And other means, such as digital cameras or

14   recorders.  I also wanted to look for floppies, USB's and

15   DVD's, because you could also store images on there, such as

16   the images that were taken and uploaded to Yahoo.  Generally,

17   people who rent computers or upgrade computers will save them

18   on those portable media devices so they always have it

19   accessible to their new computer.

20   Q.    So oftentimes in your experience the upgrade of a

21   computer means you put your old information on CD's or other

22   devices, and that's how you transfer it to your new computer?

23   A.    Yes.

24   Q.    And you then obtained the Eberle's computer and some

25   other equipment?

36

1   A.    Yes.

2  Q.  Did you conduct a forensic exam on that computer?

3  A.  Yes, I did.

4  Q.  Did you find a quantity of child pornography on the

5  computer?

6  A.  Yes, I did.

7  Q.  Separate and apart from the child pornography that you

8  found, did you find items on the computer that clearly linked

9  the computer to the Eberles?

10  A.  Yes, I found numerous chats.  I found other pictures of

11  George and Alesha and their kids.

12  Q.  And this second search would have occurred in late March

13  of 2005?

14  A.  Correct.

15       MR. TRABOLD:  Nothing further, your Honor.

16       MR. PATTON:  All right, Mr. Patton.

17            CROSS-EXAMINATION

18  BY MR. PATTON:

19  Q.  Ms. Lynn, what specific training have you received to do

20  a forensic examination of computers?

21  A.  I've received forensic training from Access Data.  I've

22  received training from Internet Crimes.

23  Q.  Access Data would be the company that manufactures

24   forensic software called Forensic Tool Kit?

25   A.   That's correct.


37


1   Q.   And is Forensic Tool Kit the forensic software program

2   that you use in your forensic evaluations of computers?

3   A.   Yes.

4   Q.   And you say you've had 300 hours of instructions on how

5   to do forensic evaluations?

6   A.   I would estimate close to 300.  Dating back to February

7   of 2003, when I started receiving training and also hands-on.

8   Q.   The 300 hours includes the hands-on time --

9   A.   As an estimate, yeah.

10   Q.   When you received the tip from Delaware County regarding

11   these Yahoo pictures and after you tracked it down to George

12   Eberle and tracked down the fact that he had a computer, you

13   wanted to try and get that computer to look at it, correct?

14   A.   That's correct.

15   Q.   While you were preparing -- the information from NCMEC

16   established that the photos were uploaded to the Yahoo account

17   on September 2, 2001, correct?

18  A.   If that's the date that's on the paper, yes.

19  Q.   When you get the Cybertip from Delaware County, you're

20  now into August of 2004, correct?

21  A.   That's when it was reported to Delaware County.

22  Q.   And then Delaware County contacts you, correct?

23  A.   That's correct.

24  Q.   So we're roughly three years past the time these photos

25  were put up on the Yahoo server, correct?

38

1  A.   Yes, that's when Yahoo notified NCMEC, the date is on the

2  paper.

3  Q.   Well, let's not confuse things.  Yahoo contacts NCMEC

4  sometime in August of 2004?

5  A.   That's correct.

6  Q.   With Yahoo saying we have found these images on our

7  server and we think they may be child pornography?

8  A.   That's correct.

9  Q.   The information Delaware County gets from Yahoo regarding

10  when the images were put onto Yahoo's server, was that the

11  images were placed on Yahoo's server on September 2nd of 2001,

12  correct?

13  A.   That's correct?

14  Q.   So in August of 2004 you want to try and get a search

15  warrant for George Eberle's computer to try and find these

16  images of suspected child pornography that had been placed onto

17  George Eberle's Yahoo my photos account?

18  A.   Or any other child pornography, yes.

19  Q.   Well, what probable cause did you have to believe that

20  there would be some child pornography, other than the Yahoo

21  photos, on Mr. Eberle's computer?

22  A.   People who generally have child pornography just don't

23  have one image.

24  Q.   How many, do they have a lot?

25  A.   Some do, yes.


39


1  Q.   And your understanding and experience would be that if

2  someone used their computer to collect, store, trade child

3  pornography, would most likely have a large number of images of

4  child pornography on their computer?

5  A.   Most likely, yes.

6  Q.   And they would want to keep these images on their hard

7  drive?

8  A.   Or on a portable storage media device.

9  Q.   So that they could keep them for long terms for either

10  trading or sexual gratification or lowering the inhibitions of

11  other children?

12  A.   Yes.

13  Q.   And they would not likely intentionally get rid of those

14  images?

15  A.   Not likely.

16  Q.   You learned from the caseworker with the Office of

17  Children and Youth Services that Mr. Eberle has a computer in

18  his house, correct?

19  A.   Correct.

20  Q.   You start working on a search warrant application to get

21  that computer, correct?

22  A.   Correct.

23  Q.   And in that search warrant affidavit you explain that

24  people who collect child pornography generally keep it and

25  don't intentionally delete it, correct?

1  A.    That's correct.

2  Q.    You also state, however, that even if they do delete it

3  for fear of being detected through the use of a forensic

4  software program, you can recover the deleted files?

5  A.    Yes.

6  Q.    And you then also say that even if someone gets a new

7  computer, someone who is storing child pornography on their

8  computer gets a new computer, most likely that person will save

9  the children pornography from the old computer before they get

10  rid of it, and then once they get the new computer, put the

11  images of child pornography onto the hard drive of their new

12  computer?

13  A.    Yes.

14  Q.    As you were preparing the search warrant to get the

15  computer from George Eberle's house, you find out through the

16  caseworker that the computer is no longer in George Eberle's

17  possession, correct?

18  A.    That's correct.

19  Q.    And that it's been returned to the rental store and

20  you're told the rental store is the House of Television in

21  Corry?

22  A.    Yes.

23  Q.    So you then contacted the House of Television in Corry,

24  correct?

25  A.    Yes.


                                41


1  Q.    To look at that computer?

2  A.    For me to get the computer.

3  Q.    Because at this point you feel you have probable cause to

4  believe that there is child pornography on that hard drive?

5  A.    Possibly, yes.

6  Q.    Well, you think you have probable cause to believe that

7  there is child pornography on the hard drive?

8  A.    Yes.

9  Q.    The person from the House of Television that you talk to,

10  do you know who you spoke to?

11  A.    It's in my report, I believe his name was Craig.

12  Q.    Craig Culhane?

13  A.    Yes.

14  Q.    Who's the manager of the House of Television?

15  A.   Yes.

16  Q.   And you told Mr. Culhane that you wanted to get the

17  computer that had just been turned back in by George Eberle,

18  correct?

19  A.   Yes, but it had not just been turned back in.

20  Q.   Well, you wanted the computer that had been returned by

21  George Eberle?

22  A.   Yes, I believe it was actually taken by the House of

23  Television, but yes, the computer that the Eberles had used.

24  Q.   Mr. Culhane told you that the Eberles had either turned

25  the computer back in or it had been taken by the House of


42


1  Television on or about August 20, 2004?

2  A.   That's correct.

3  Q.   And you spoke with Mr. Culhane on September 3rd of 2004?

4  A.   Yes.

5  Q.   Mr. Culhane told you that the computer had been

6  re-rented?

7  A.   Yes.

8  Q.   And he told you that before it had been re-rented, it had

9   been reformatted to be re-rented, correct?

10  A.   Yes.

11  Q.   Now, when you get this information, does that lead you to

12  believe that there's now no way you could try and get any

13  information off the computer relative to George Eberle?

14  A.   No, not no way.

15  Q.   Because you know how to use forensic software, correct?

16  A.   Correct.

17  Q.   So it is accurate to say that when information is deleted

18  from a hard drive, it doesn't mean the information is

19  physically removed from the hard drive?

20  A.   Right, when it's deleted from the accessible area of

21  allocated space, it's put in into unallocated space.  And then

22  it has the chance to be overwritten and essentially deleted.

23  Q.   When it goes into unallocated space, from allocated space

24  to unallocated space, physically the file on the hard drive is

25  not moved, correct?


43


1   A.   Correct.

2   Q.   All that's happening is the operating system is being

3  told you don't have to worry about keeping the data stored at

4  this location on the hard drive anymore?

5  A.   Yes.

6  Q.   So the computer can at some point use that space again?

7  A.   Yes.

8  Q.   But if it doesn't use that space again, that data is

9  still sitting on the hard drive the same way it was sitting

10  when it was saved on the computer?

11  A.   Until it's overwritten, yes.

12  Q.   Then you knew all this information when you were speaking

13  with Mr. Culhane, correct?

14  A.   Correct.

15  Q.   So that's why you believed that even though the computer

16  had been -- some procedures had been done by the House of

17  Television to prepare the computer for re-renting, you believed

18  you could still find evidence of the pictures being on the hard

19  drive?

20  A.   Yes.

21  Q.   Because, again, it was your belief that these images from

22  Yahoo were somewhere on that hard drive in the unallocated

23  space?

24  A.   Yes.

25  Q.    And Mr. Culhane agreed to get you the computer so you

44

1   could come and pick it up, is that correct?

2   A.    That's correct.

3   Q.    And you went to the House of Television and Mr. Culhane

4   turned the computer over to you, correct?

5   A.    Yes.

6   Q.    And Mr. Culhane said this is the computer that the

7   Eberles had or words to that effect?

8   A.    I'm pretty sure it was Mr. Culhane, yes.

9   Q.    And you had made it clear to him which particular

10  computer you wanted, correct?

11  A.    Yes.

12  Q.    And he then provided that computer to you?

13  A.    Yes.

14  Q.    You then do a forensic evaluation of that computer?

15  A.    Yes.

16  Q.    You picked up the computer I believe on September 4,

17  2004, correct?

18  A.    Yes.

19  Q.    Did you discuss with Mr. Culhane or whoever was at the

20  House of Television when you picked up the computer, about the

21  new owner and how long the new owner had it?

22  A.    No, I just knew that it was returned August 20th of 2004

23  and that it had been re-rented.

24  Q.    Do you know when it had been re-rented?

25  A.    No.


                                45


1   Q.    Did you ask when it had been re-rented?

2   A.    No, he just said it was re-rented.

3   Q.    So you did not know the length of time that the new user

4   had been using the computer?

5   A.    No.

6   Q.    For your forensic evaluation, you did what is called data

7   carving of the unallocated space, correct?

8   A.    Correct.

9   Q.    Data carving is telling the forensic software program to

10  go into the unallocated space and you can ask the program to

11  look for particular types of files, correct?

12  A.    Correct.

13  Q.   One particular type of file is called JPEGs, correct?

14  A.   Correct.

15  Q.   JPEGs are digital images, correct?

16  A.   Correct.

17  Q.   Generally speaking, anyone who has a digital photo and

18  puts it on their computer, the computer is going to refer to

19  that photo as a JPEG file, correct?

20  A.   Most likely, yes.

21  Q.   That's based on the fact the extension of the file is

22  JPG, correct?

23  A.   Or JPEG.

24  Q.   So when you tell the forensic software program do a data

25  carving of the unallocated space for JPEGs, you're looking for


46


1  any images that are in the unallocated space on that hard

2  drive, correct?

3  A.   Correct.

4  Q.   You did that in this case with the computer you got from

5  the House of Television?

6  A.   Yes.

7   Q.   And you found JPEG images in unallocated space?

8   A.   Yes.

9   Q.   You reviewed all those images?

10  A.   Yes.

11  Q.   How many did you find?

12  A.   I don't know.

13  Q.   Well, Forensic Tool Kit allows you to create reports

14  regarding the information that's found during the searches,

15  correct?

16  A.   Yes, I didn't do a report on this because I didn't find

17  anything relevant to the case.

18  Q.   Forensic Tool Kit, it has built into the program that you

19  can, and the program does a lot of this for you, says put all

20  the JPEGs that we found, put it in a report and print out for

21  me, you can do that with Forensic Tool Kit?

22  A.   No, you have to individually select each image in order

23  for it to be exported out for the report, I didn't select any

24  images.

25  Q.   Forensic Tool Kit will show you all the JPEGs it has

47

1  carved out of unallocated space, correct?

2  A.   Looking at them, yes.

3  Q.   And then you can select them if you want to or bookmark

4  them?

5  A.   Or flag them, yes.

6  Q.   And then Forensic Tool Kit can generate a report that

7  contains those images and whatever information that comes along

8  with those images, correct?

9  A.   Correct.

10  Q.   So you looked through all the JPEG images, there were

11  thousands of JPEG images?

12  A.   I don't recall how many.

13  Q.   And these are JPEG images that are coming from

14  unallocated space, correct?

15  A.   Correct, the ones that were data correct.

16  Q.   And these aren't ones that we're talking about the new

17  user put on and they're in the new user's my photos file?

18  A.   No, but the new user could have deleted them and put them

19  in unallocated space.  Like I said earlier, the dates and times

20  aren't there in unallocated space.

21  Q.   You didn't find any of the 13 images that Yahoo had

22  turned over to NCMEC that were the suspected child pornography,

23  correct?

24  A.   That is correct.

25  Q.   And you specifically looked for any or all of those

                                    48

1  images?

2  A.   Yes.

3  Q.   In addition to looking for any child pornography?

4  A.   Or anything relating to the Eberles.  Like I said, I was

5  looking for pictures.  I know they had the web cam when they

6  had children at the house, I was looking for anything to link

7  them to using this computer.

8  Q.   Well, even though you didn't have Forensic Tool Kit to

9  create a report of your forensic evaluation, you wrote a report

10  concerning your evaluation, your forensic evaluation of the

11  computer that you got from House of Television, correct?

12  A.   Yes, I wrote that I didn't find any pictures.

13  Q.   That report, the purpose of that report was to document

14  what you had done, correct?

15  A.   Correct.

16  Q.   And what you had found?

17  A.   Yes.

18  Q.   Correct?

19  A.   Yes.

20  Q.   Do you see on your screen there, does that appear to be a

21  portion of your report?

22  A.   Yes.

23  Q.   Do you see where it's dated 9/28/2004?

24  A.   Yes.

25  Q.   That is the report you wrote detailing your forensic

49

1  evaluation of the computer you received from the House of

2  Television, correct?

3  A.   Yes.

4  Q.   Could you highlight for me, if you could, please, where

5  you state that you did searches on the hard drive to look for

6  anything linking the computer to the Eberles?

7  A.   I did not put that in the report.

8  Q.   Excuse me, what?

9  A.   I did not put that in the report.

10  Q.  You did not put in your report that you did any type of

11  searching to try and find information that would link the

12  computer to the Eberles?

13  A.  No, I did not.

14  Q.  The report states, but it does detail the data carving

15  that you did, correct?

16  A.  Yes.

17  Q.  Looking for HTML sites -- HTML sites are basically web

18  pages, correct?

19  A.  Yes.

20  Q.  AOL lists, those would be if the computer is using

21  America Online as its Internet service provider, buddy lists,

22  things of that nature?

23  A.  Yes, it was one of the options for data carving.

24  Q.  And then for the JPEGs?

25  A.  Yes.


50


1  Q.  But there's no description in there of searching for

2  terms saying you searched for terms George or Alesha or Eberle,

3  is there?

4   A.   No.

5   Q.   There's nothing in there saying that I ran a search for

6   glepa2001, is there?

7   A.   No.

8   Q.   And, of course, the computer you had been given, the

9   House of Television said look, this is the computer the Eberles

10   had used, correct?

11   A.   Yes.

12   Q.   And so what you're really looking for on that computer

13   was trying to find any images of child pornography, correct?

14   A.   Yes.

15   Q.   And if you found images of children pornography, then you

16   would be trying to charge George or Alesha Eberle with

17   receiving or possessing that child pornography?

18   A.   If they were the images that were uploaded.

19   Q.   If you found those images on that hard drive, it was your

20   intention to present the case to the District Attorney's office

21   to try and prosecute it?

22   A.   Yes.

23   Q.   And imagine for a moment that you had found one of those

24   13 images on the computer's hard drive, okay?

25   A.   Okay.

51

1  Q.   Also imagine for a moment that you didn't find the words

2  George or Alesha or Eberle or anything on the hard drive

3  linking the computer to the Eberles.  You would still have

4  presented the case to the District Attorney's office to

5  prosecute George Eberle for possessing those images, correct?

6  A.   I would have sat with an attorney and discussed it.

7  Q.   Because these links are like business records from the

8  House of Television that can establish who has a particular

9  computer during a particular date, correct?

10  A.   Yes.

11  Q.   And so you can link the computer to the Eberles through

12  the House of Television and the House of Television's rental

13  records showing who had rented this particular computer,

14  correct?

15  A.   Yes.

16  Q.   Then not only did you not find any of the 13 images that

17  were from Yahoo, you found no images of child pornography

18  whatsoever anywhere on the hard drive?

19  A.   That's correct.

20  Q.    Now, you testified today that you honestly believed you

21  had the wrong computer from the House of Television?

22  A.    Yes.

23  Q.    That's your testimony.  Show me in your report on the

24  September 28, 2004 entry, where you put in your report that you

25  don't think you have the computer that was used by George

52

1  Eberle?

2  A.    I didn't.

3  Q.    You never called the House of Television to say hey, I

4  think you might have given me the wrong computer?

5  A.    No.

6  Q.    You never went to the House of Television to speak with

7  them to say look, I asked for the Eberle's computer, I don't

8  think you gave me the Eberle's computer?

9  A.    That's correct.

10  Q.    So you think you had probable cause to believe that the

11  computer George Eberle rented from the House of Television had

12  child pornography on the hard drive -- when you then believe,

13  develop to believe that the computer that the House of

14    Television gave you wasn't George's computer, you said the heck

15    with it, I'm done with it, I'm too busy, I got other things to

16    do?

17    A.    Since I didn't find anything on there, yes.

18    Q.    Well, but you still believed at this point, according to

19    your testimony today, you thought you didn't have the Eberle's

20    computer, right?

21    A.    Possibly, yes.

22    Q.    If you didn't have the Eberle's computer, you still

23    believed you had probable cause to believe that whatever

24    computer George Eberle had possessed, that he had rented from

25    the House of Television, had these images of child pornography

53

1    from the Yahoo account on the hard drive, correct?

2    A.    Correct.

3    Q.    And so you still believe that there is some computer in

4    the inventory of the House of Television that has child

5    pornography on it and you take absolutely no steps whatsoever

6    to try and locate that computer?

7    A.    That is correct.  Possibly with the timeframe, the

8  evidence may not be there.

9  Q.   But you already established that in your forensic skills

10  you still believe there's probable cause to believe that the

11  images of child pornography that Yahoo had identified were on

12  whichever computer George Eberle had rented from the House of

13  Television, correct?

14  A.   Correct.

15  Q.   And you still believe that after you did your forensic

16  evaluation of the computer that the House of Television gave

17  you?

18  A.   I believe it could have been stored on a portable storage

19  device.

20  Q.   But, ma'am, you said that every hard drive that Mr.

21  Eberle would have, after he already has these images of child

22  pornography on his hard drive back in August or September of

23  2001, when they get uploaded, every computer he then has from

24  that point on is going to have these images of child

25  pornography on the hard drive, correct?

54

1  A.   No, not unless he put it there.

2  Q.    Did you not put in your affidavit that they would be on

3  the hard drive, they would save it on the hard drive --

4         THE COURT:  Just for the record, there's two

5  affidavits.

6  BY MR. PATTON:

7  Q.    You put it in both of your affidavits, for both search

8  warrants, that someone had the child porn on the hard drive of

9  a computer, they got rid of that computer and got a new

10  computer, they would store the child porn from their first

11  computer on some kind of storage media, and when they got their

12  new computer, they would put the images of child pornography

13  that they had stored on the storage media onto the hard drive

14  of their new computer, correct?

15  A.    Correct.

16  Q.    Because when you got the search warrant for the Eberle's

17  computer from the House of Television, you weren't getting any

18  other storage media or anything from George Eberle, correct?

19  A.    That's correct.

20  Q.    You were saying you had probable cause to believe that on

21  the hard drive of that computer, that images of child

22  pornography from Yahoo would be found?

23  A.   Yes.

24  Q.   You didn't find them on the computer that the House of

25  Television gave you saying -- with the House of Television

55

1  saying here's the Eberle's computer?

2  A.   That's correct.

3  Q.   So you didn't draw the conclusion that hey, you know

4  what, maybe I was just wrong, maybe George Eberle's computer

5  doesn't have child pornography on the hard drive?

6  A.   No.

7  Q.   You didn't reach that conclusion?

8  A.   No.

9  Q.   Why not?

10  A.   Because I believe that possibly it wasn't the right one.

11  Also, like I said, they could have portable storage media

12  devices.  They don't rent thumb drives or CD's.

13  Q.   Assume that George Eberle had had child pornography on

14  the hard drive of the computer he rented from the House of

15  Television, but before he took it back to the House of

16  Television he stored the child pornography on some kind of

17  storage device, a CD, whatever, and then deleted it from the

18  hard drive, then turned it back into the House of Television,

19  with your forensic examination skills, you would still believe

20  there was probable cause those images would still be on the

21  hard drive, correct?

22  A.    If they were put on the hard drive, yes.

23  Q.    To get transferred from a hard drive to a storage media,

24  the images would have to be on the hard drive first, correct?

25  A.    No, not essentially.  You can just save a picture and


56


1  place it right on to your thumb drive through the USB port.

2  Q.    We're talking about pictures that were -- you said that

3  you believed were on their hard drive, correct?

4  A.    Yes.

5  Q.    And you were getting a search warrant for George Eberle's

6  computer, correct?

7  A.    Correct.

8  Q.    You weren't getting -- I'm talking about the first search

9  warrant you got here for the House of Television's computer.

10  That search warrant wasn't for any storage media or anything

11  like that, correct?

12  A.  Right.

13  Q.  That was a search warrant for the computer George Eberle

14  had rented because you were saying you had probable cause to

15  believe that on the hard drive of that computer you would find

16  these images of child pornography turned over by Yahoo,

17  correct?

18  A.  Correct.

19  Q.  I'm not trying to trick you.

20  A.  I'm trying to follow you.

21  Q.  You got a search warrant for the computer George Eberle

22  rented from the House of Television?

23  A.  Right, and that search warrant, I believe, if I could

24  look at the front page, did ask for any and all portable

25  storage devices.


57


1  Q.  I'm showing you Defendant's Exhibit A, this is the same

2  Defendant's A that's attached to the motion -- all right.  The

3  search warrant that you're looking at right now, is the search

4  warrant for the computer from the House of Television, correct?

5   A.   Yes.

6   Q.   When you initially wrote that search warrant out, you

7   originally were intending on having the place to be searched to

8   be George Eberle's home, correct?

9   A.   That is correct.

10  Q.   Because at the time you were physically writing it, you

11  thought the computer was still at George's house, right?

12  A.   That is correct.

13  Q.   You actually had the warrant done up and ready to go for

14  George's house when you found out the computer had been taken

15  back to the House of Television, correct?

16  A.   That is correct.

17  Q.   When you got the information back that the computer had

18  been returned to the House of Television, you changed the place

19  to be searched on the warrant, correct?

20  A.   Yes, that's correct.

21  Q.   And so the items to be searched for does list computers

22  and storage media and things of that nature, correct?

23  A.   Yes.

24  Q.   But that was written in there when you were writing the

25  search warrant in anticipating searching George's home,

58

1   correct?

2   A.   Yes.

3   Q.   You didn't have any reason to believe that when George

4   Eberle turned the computer back into the House of Television,

5   George also took down his collection of child porn that he had

6   stored on the CD and given to the House of Television, did you?

7   A.   No, I don't think so.

8   Q.   You didn't have any probable cause to believe that at the

9   House of Television you were going to find any of George

10   Eberle's electronic storage media, other than the hard drive of

11   the computer that he had rented from them, correct?

12   A.   Correct.

13   Q.   With regards to that search warrant as it related to

14   searching the House of Television for the computer rented by

15   George Eberle, your probable cause was that there was probable

16   cause to believe that the hard drive of that computer would

17   contain these 13 images of child pornography Yahoo had found on

18   its server, correct?

19   A.   Yes, if he had put it there.

20   Q.   You said you had probable cause to believe that he had

21 put it there, that it was on there, correct?

22 A.    Correct.

23 Q.    That's the whole way that you establish probable cause to

24 believe it was on the hard drive by saying it would be on every

25 hard drive of every computer that he owned because he would

59

1 save it to the storage media -- to some storage media, he would

2 also then put it back onto the hard drive of any new computer

3 he got?

4 A.    Right.

5 Q.    And also in the affidavit in support of that search

6 warrant, you put in there that the computer had been returned

7 to the House of Television, correct?

8 A.    Yes.

9 Q.    And you put in there that you had talked with Mr. Culhane

10 from the House of Television who had confirmed that that

11 computer that had been rented by George Eberle was there?

12 A.    Yes.

13 Q.    And could you read that portion?

14 A.    Sure.  "This officer spoke with manager Craig Culhane of

15  the House of Television rental and their possession of a Hewett

16  Packard previously rented by George Eberle."

17  Q.    Your sworn affidavit to the district justice, you're

18  putting in there you talked with the people from the House of

19  Television and they, the House of Television, have the specific

20  computer that had been rented by George Eberle, correct?

21  A.    Yes, I spoke with them on the 3rd and told them I was

22  going to be getting a search warrant for him.

23  Q.    You assured the judge in your affidavit that the computer

24  you were getting from the House of Television was the computer

25  that George Eberle had rented from the House of Television?


60


1  A.    That's what I was told, yes.

2       THE COURT:  We're going to take a five-minute

3  recess.

4       (Recess from 10:20 a.m.; until 10:30 a.m.)

5       THE COURT:  All right, Mr. Patton.

6  BY MR. PATTON:

7  Q.    Detective Lynn, can we agree that in the affidavit you

8  wrote in support of the search warrant to get the computer from

9   the House of Television, your affidavit states that you have

10   probable cause to believe that on the hard drive of that

11   computer would be found the 13 images that Yahoo turned over to

12   NCMEC?

13   A.   Yes.

14   Q.   Can we agree that your forensic evaluation of that

15   computer showed that those images were not on that hard drive?

16   A.   That's correct.

17   Q.   Can we agree that there were no images of child

18   pornography on that hard drive?

19   A.   Correct.

20   Q.   And if that computer really had been the one that the

21   Eberles used, then the reasonable conclusion to draw from those

22   facts would be that in reality those 13 images had never been

23   on the hard drive of George's computer, correct?

24   A.   Can you repeat.

25   Q.   If you really did get from the House of Television the


61


1   computer that George Eberle had rented from them that had been

2   returned to the House of Television, the reasonable conclusion

3   to be drawn from your forensic evaluation of that computer

4   would be that the images, the 13 images from Yahoo, had never

5   been on the hard drive of that computer?

6   A.   Could possibly.

7   Q.   Well, that is the reasonable conclusion to be drawn given

8   the forensic evaluation you did of the computer, correct?

9   A.   Given the other circumstances, yes.

10  Q.   What other circumstances?

11  A.   Like I stated, I didn't find anything relating the

12  Eberles to that, use of the computer.

13  Q.   But my question is if you assume that was the Eberle's

14  computer, I under understand that's not the conclusion you

15  drew?

16  A.   Correct.

17       MR. TRABOLD:  I'm going to object, what's the

18  relevance, we're here to talk about the computer that she

19  examined and what her conclusion was.  Not hypotheticals about

20  whether if in fact this was really the Eberle's computer

21  because that's not relevant to our determination.

22       THE COURT:  It's overruled, go ahead.  Last time

23  through, then go on.

24  BY MR. PATTON:

25  Q.   If in fact the computer you received from the House of

62

1  Television was the computer that had been rented by them to

2  George Eberle, the reasonable conclusion to be drawn from your

3  forensic evaluation of that computer was that the 13 images of

4  suspected child pornography that Yahoo identified had not been

5  on that hard drive?

6  A.   Correct.

7  Q.   And, indeed, no images of child pornography had ever been

8  on the hard drive?

9  A.   Correct.

10  Q.   Now, you say you drew the conclusion that the House of

11  Television must have given you the wrong computer?

12  A.   That's a possibility.

13  Q.   But you never then followed up with the House of

14  Television to try and ask them to find the real computer,

15  correct?

16  A.   That's correct.

17  Q.   Or you never went back to the House of Television to

18   actually confirm that you had in fact been given the correct

19   computer?

20   A.   That's correct.

21   Q.   Because you simply had too many other things on your

22   plate?

23   A.   Given other investigations, yes.

24   Q.   Do you really think it's hard to find child pornography

25   on the Internet?

63

1   A.   If you know where to look no, it's not.

2   Q.   Do you think it's difficult for anybody using the

3   Internet, just a standard Internet user, do you think it's hard

4   for them to find child pornography?

5   A.   I think you have to actively search for it, you can't

6   just put child pornography in Google and do search.

7   Q.   If you're interested in finding child pornography on the

8   Internet, your purpose is to get on the Internet and try and

9   find child pornography, your opinion is it's difficult to find

10   that?

11   A.    If you're interested in looking for it, you're going to

12    search a little bit to find it.  It's not like adult

13    pornography where you can get a pop-up immediately or when you

14    do a search.  You have to actively search for it.

15    Q.   Are you aware that the Department of Justice is

16    subpoenaing Google for the search terms to put into Google,

17    trying to prove up that people often unintentionally get child

18    pornography in response to their search terms to argue that

19    federal law has to be allowed to regulate child pornography?

20    A.   No.

21    Q.   Let's move on to March of 2005.  You become aware that

22    Tiffany Smith is making allegations that --

23          THE COURT:  Did you say 2001?

24          MR. PATTON:  I meant to say 2005.  If I said 2001, I

25    meant March of 2005.

64

1          THE COURT:  All right.

2    BY MR. PATTON:

3    Q.   This is when you received information that Tiffany Smith

4    is saying that George and Alesha Eberle took photos of her

5    using their web cam, correct?

6   A.   Correct.

7   Q.   And that supposedly George had sex with her while Alesha

8   was videotaping?

9   A.   I'd have to re-read the report to see exactly who was

10  doing what, but roughly.

11  Q.   When you found -- well, you watched the forensic

12  interview, correct?

13  A.   Correct.

14  Q.   And in the forensic interview Tiffany says that this

15  happened when she was 12-years-old, just getting ready to turn

16  13, correct?

17  A.   I don't recall exactly the age.  I'd have to look and see

18  if I have it.

19  Q.   But she also stated that this happened right before she

20  started 6th grade, do you recall that?

21  A.   Like I said, I'd have to double check.

22  Q.   Now you were sitting watching this as it happened,

23  correct?

24  A.   Back in March, yes.

25  Q.   As the interview was actually taking place, you are

65

file:///A|/EBERLESP.TXT

1  watching it and listening to it in realtime?

2  A.   Yes.

3  Q.   Now, as you were sitting and watching that, did you have

4  the photos that Yahoo had turned over to NCMEC?

5  A.   In my folder, yes.

6  Q.   Had you met with Tiffany before the forensic interview?

7  A.   I don't recall, no.  Unless I said hi in the lobby, other

8  than that, no.

9  Q.   You didn't interview her before the forensic interview?

10 A.   No.

11 Q.   But you had these photos from Yahoo with you?

12 A.   Yes.

13 Q.   Why did you have them with you?

14 A.   Because we had the phone call from the Corry Police

15 Department, like I said, that they said they had a girl saying

16 that she was raped, molested, and had photos taken of her by

17 the Eberles.  I had photos of a young girl that were found in

18 the Eberle's Yahoo account.  So yes, I had them there.

19 Q.   And I believe you explained that the purpose of the

20 forensic interview was to make sure that a trained interviewer

21 discussed with the alleged victim to try and prevent any type

22  of even unintentional misleading or misinformation being

23  developed?

24  A.   Yes.

25  Q.   And that's the whole point of doing the forensic

66

1   interview?

2   A.   Yes.

3   Q.   Why didn't you have the forensic interviewer show the

4   photographs to Tiffany?

5   A.   Because at that time the forensic interviewer was only

6   trained on asking questions about rape and molestation.  We had

7   a separate account, until she said it in the interview about

8   being photographed, we weren't going to mention it at all.

9   Q.   Then why did you bring the photos with you?

10  A.   In case she did state in the interview that she had

11  pictures taken of her, so we could ask her if she could tell us

12  anything she was wearing or any type of particular poses.

13  Q.   After Tiffany said during the interview that the

14  photographing took place and explained that, did you then

15  decide I'm going to show her the photographs?

16  A.    My partner and I did, yes.

17  Q.    Well, at that point in time, why didn't you have the

18  forensic evaluator do that rather than you guys?

19  A.    We decided we would do it.

20  Q.    And you decided that you were going to do it without

21  having the videotape?

22  A.    Yes, the videotape, we usually just videotape the

23  forensic interview.  When the interviewer comes in, she does

24  all the stuff with the DVD player and the recorder, to shut it

25  off and finalize the CD.


67


1  Q.    But you could have asked her to keep the videotape

2  rolling while you guys showed Tiffany the images, correct?

3  A.    I could of, yes.

4  Q.    The images that were from Yahoo, at least on some of the

5  images you see the face of the girl, correct?

6  A.    Partial face.

7  Q.    Some of them you see the whole face, correct?

8  A.    I don't recall an actual full head shot.

9  Q.    But you were able to look at Tiffany Smith, correct,

10  during the forensic evaluation?

11  A.  Yes.

12  Q.  You were able to look at her as you were preparing her to

13  look at the photos, correct?

14  A.  Yes.

15  Q.  And you had already seen the photos, correct?

16  A.  Yes.

17  Q.  Did you look at her and try to make a determination in

18  your mind as to whether or not you thought that these pictures

19  from Yahoo were pictures of this young lady who was standing

20  right in front of you?

21  A.  It could be possible, but there was also four years in

22  between, people grow up, people change hair colors.

23  Q.  So what did you say to her before you showed her the

24  photographs?

25  A.  I asked her to describe to me about the images that were

68

1  taken.  She said they were taken by a web cam and that she was

2  standing up and doing various poses.  Sometimes she had a bra

3  on, sometimes she didn't.  I asked her if at any particular

4    time, given her age, did she have a particular item on such as

5    necklaces, a baret, colors of clothing, anything she favored.

6    And she said that she always wore a necklace with a pendent and

7    she always wore a silver ring on her left hand.

8    Q.    How did she describe the pendent, the necklace?

9    A.    I believe she said it had something to do with a heart.

10   Q.    It was a half heart, correct?

11   A.    Could be.

12   Q.    That she got from her sister?

13   A.    Yes, she said she got it from her sister.

14   Q.    And on the images from Yahoo, you can see somewhat the

15   pendent, correct?

16   A.    Somewhat, it's very small.

17   Q.    And it's circular, right?

18   A.    I'd have to look at the picture.

19   Q.    Did you bring the disk with the images?

20   A.    No, I did not.

21         MR. PATTON:  Judge, I have the disk with the images

22   on them, I will show them to the court later when I have a

23   witness on when we're going to have the computer running.

24         THE COURT:  All right.

25  BY MR. PATTON:


69


1  Q.   From your review of what you could see on the photos from

2  Yahoo, you thought that was a pendent on that image?

3  A.   I don't recall her specifically stating it was a heart.

4  Q.   Well, I just asked you if she said it was a heart, you

5  said yes, it was a heart or a half heart, something she got

6  from her sister?

7  A.   I know she got something from her sister, I don't believe

8  she actually stated to me that her pendent was a heart.  May I

9  look at my report here.

10  Q.   Sure.

11       THE COURT:  When you get where you're going, let us

12  know what page number?

13       THE WITNESS:  Sure.  I don't have anywhere that she

14  said it was a heart.

15  BY MR. PATTON:

16  Q.   So, now your testimony, is it accurate to say your

17  testimony is you don't remember if she said anything about what

18  kind of pendent it was?

19   A.   Yeah, I don't have it in my report that she stated

20   anything about what type of pendent.

21   Q.   You didn't ask her?

22   A.   No.  That is when we showed her the pictures.

23   Q.   And when she looked at the photos, did you tell her

24   anything as she was looking at the photos, did you say anything

25   to her?


70


1   A.   Asked her if she knew who it was and if she did, if she

2   could tell us who they were.

3   Q.   And her response was?

4   A.   She started crying and said that's me.

5   Q.   Well, could you explain, if you could, what happened

6   between the time that the forensic evaluation was conducted,

7   which was, I believe, March 24th of 2005 -- do you want to

8   check your report to see if that's the correct date?

9   A.   Of the forensic interview?

10   Q.   Yes.

11   A.   March 24th.

12   Q.   2005, correct?

file:///A|/EBERLESP.TXT

13   A.   Correct.

14   Q.   That's the same date that you showed the photos to

15   Tiffany, correct?

16   A.   Yes.

17   Q.   What happened between March 24, 2005 and last week, that

18   allowed somebody to discover that these pictures weren't of

19   Tiffany?

20   A.   Last week when we sat down with her, she stated that they

21   were not of her.

22   Q.   You just sat down and she volunteered hey, I've been

23   thinking about it --

24   A.   I wasn't in the room when it happened.

25   Q.   After the forensic evaluation of March 24, 2005, you and

71

1   your partner prepare criminal complaints and arrest warrants

2   for George and Alesha Eberle, correct?

3   A.   Correct.

4   Q.   You charge them with a host of criminal offenses related

5   to the alleged molestation of Tiffany Smith, is that right?

6   A.   That's right.

7   Q.    You then went and executed the arrest warrants to George

8   and Alesha's residence, is that correct?

9   A.    That's correct.

10  Q.    And while you were doing that, you noticed that there was

11  a computer in that residence?

12  A.    No, I knew there was a computer there prior to that.

13  Q.    How did you know that?

14  A.    Because Tiffany said there was.  So in addition to the

15  arrest warrants, we had a search warrant.

16  Q.    So you find out on March 24, 2005, that George and Alesha

17  now have a computer in their house?

18  A.    Yes.

19  Q.    And you want to try and get a search warrant for that

20  computer, correct?

21  A.    Correct.

22  Q.    To look for the images, the 13 images from Yahoo that

23  Tiffany says are her, correct?

24  A.    Yes.

25  Q.    That's the probable cause you put forth in the affidavit

72

1  in support of the search warrant that's prepared in March of

2  2005 --

3  A.    Do you have the second warrant that I can look at please,

4  sir.

5         MR. PATTON:  Judge, this would be Defendant's

6  Exhibit B as attached to the motion.

7         THE COURT:  Attached to your motion?

8         MR. PATTON:  Correct.

9         THE WITNESS:  Thank you.

10  BY MR. PATTON:

11  Q.    Your search warrant, after it establishes who you are and

12  your expertise, it starts talking about the information Tiffany

13  gave in the forensic evaluation, correct?

14  A.    Correct.

15  Q.    And to back up just a moment, is it accurate to say that

16  the first paragraph of your affidavit sets forth who you are

17  and how you're employed and the training that you have

18  received, is that correct?

19  A.    Yes.

20  Q.    States that you're a police officer employed as a county

21  detective in the Erie County District Attorney's office, and

22  that you are charged with the duties of investigating

23   violations of the Pennsylvania Crimes Code, that you received

24   specialized training in the investigation of computer related

25   criminal activity, is that correct?


73


1   A.   Yes.

2   Q.   It says in the past two years you have participated in

3   several executions of search warrants for computer stored

4   records and evidence, right?

5   A.   Yes.

6   Q.   Nowhere in that paragraph does it explain that you have

7   any training at all with regard to the sexual exploitation of

8   children, correct?

9   A.   In that paragraph, no, it doesn't.  Well, computer

10   related criminal activity, but it doesn't specifically state

11   sexual exploitation.

12   Q.   It doesn't mention that you have any kind of specialized

13   training with regard to the activities of people interested in

14   child pornography, correct?

15   A.   No.  Like I said, it says computer related criminal

16   activity.

17  Q.    Well, would it be accurate to say that someone can be

18  trained in computer-related investigations, for example, like

19  being able to do forensic type evaluations, but not also have

20  any type of training on child pornographers and the qualities

21  they exhibit; is that a fair statement?

22  A.    Fair statement, yes.

23  Q.    After you lay forth the information Tiffany provided

24  about the alleged photographs taken of her with the web cam and

25  George's alleged rape of her while Alesha videotaped it, you


74


1  discuss the information that you received through Delaware

2  County and NCMEC from Yahoo, correct?

3  A.    Yes.

4  Q.    Laying out that there are these images that Yahoo found

5  on their server, that Yahoo turned over to NCMEC, who then went

6  to Delaware County, who then directed it to you, correct?

7  A.    Yes.

8  Q.    Basically details the investigation you had previously

9  done in August and September of 2004, regarding tracking down

10  the Yahoo account to George Eberle, correct?

11  A.    Yes.

12  Q.    You talk about using the IP address in tracking that

13  through Internet service providers to find out that this

14  person, this glepa2001, was George Eberle, correct?

15  A.    Correct.

16  Q.    You then explain that Tiffany was shown the Yahoo photos

17  and said yes, that's me in the photos, correct?

18  A.    Correct.

19  Q.    You then give the information that was very similar, if

20  not virtually identical, as from the search warrant application

21  you had done for the House of Television computer about that

22  child pornographers keep their child pornography for a long

23  time and even if they don't keep the child pornography, through

24  forensic examinations you can recover that type of deleted

25  information, correct?


75


1  A.    In addition to other stuff, yes.

2  Q.    And you also put in information about how if someone has

3  child pornography stored on their computer, even if they get a

4  new computer, they'll save the child pornography on some type

5  of storage media before they get rid of their old computer, but

6  that when they get a new computer, they'll upload the child

7  pornography back onto the new computer?

8  A.   Most likely, yes.

9  Q.   Based on those facts, you had probable cause to believe

10  that the images from the Yahoo, that Yahoo found, these 13

11  images, were on the hard drive of the computer that was in the

12  Eberle's home, correct?

13  A.   Correct.

14  Q.   And also potentially on other storage media in the home?

15  A.   Correct.

16  Q.   But also specifically on the hard drive, the computer's

17  hard drive?

18  A.   Correct.

19  Q.   Because the search warrant asks for permission to search

20  the hard drive of the computer, correct?

21  A.   Correct.

22  Q.   Along with any other electronic storage media found in

23  the home?

24  A.   That's correct, yes.

25  Q.   So is it accurate to say that in the affidavit you did in

1   March of 2005, the premise for your statement in your affidavit

2   that there was probable cause to believe that the images from

3   Yahoo were on the hard drive of the computer in the Eberle's

4   house, went as follows.  At some point in time these images

5   were on George and Alesha's hard drive.  Because George and

6   Alesha are people that have an interest in child pornography,

7   they're very unlikely to delete those images.  And even if they

8   do delete them, we can probably find them using forensic

9   software programs.  And even if they've gotten new computers,

10  they would have stored these pictures before they got rid of

11  the old computer, and then put the pictures on the new computer

12  and that's why I believe there is probable cause to believe

13  that these images are on this hard drive three-and-a-half years

14  after they were uploaded to Yahoo?

15  A.   Yes.

16  Q.   And for that probable cause finding to be logically

17  correct, each computer George Eberle had from August or

18  September 2nd of 2001, when these images were uploaded to Yahoo

19  and if the images themselves were taken with a web cam hooked

20   up to the computer, every computer George had would have these

21   images of children pornography on them?

22   A.   Most likely.

23   Q.   And even if he got rid of the old ones and had gotten new

24   ones, the images would be put on the new computer?

25   A.   If he had a lot of portable storage media device, he

77

1   could put it into the computer and put them on the computer

2   again, yes.

3   Q.   I'm going to have you take a look at the screen for a

4   minute.  This is page four of the affidavit.

5   A.   I can't read anything on there.  Can I just look at the

6   paper.

7   Q.   Yes.

8   A.   Okay.

9   Q.   This is on page four of the affidavit, and we're in the

10   second paragraph, the paragraph that starts "based on this

11   officer's past experience and training," do you see that?

12   A.   Yes.

13   Q.   Six lines down, about the middle of the page starts with

14   the sentence "based on her past experience and training, this

15   affiant believes that persons who use personal computers in

16   their homes tend to retain their personal files and data for

17   extended periods of time even if a person has replaced, traded

18   in or upgraded to a new personal computer.  This affiant

19   believes personal computer users routinely transfer most of

20   their data onto their new computers when making an upgrade.

21   This data transfer is often done by saving files from the old

22   computer to media sources (CD's or floppy disks, Zip drives,

23   USB port device), then opening them onto the new computer and

24   saving them to the new hard drive?"

25   A.   Yes.

78

1   Q.   That's what your affidavit states?

2   A.   Yes.

3   Q.   So your affidavit states that in your experience, in your

4   belief, if someone gets rid of their old computer, they save

5   all of the information that's on the hard drive of the old

6   computer and not just store it on storage media, but then put

7   it onto the hard drive of their new computer, correct?

8   A.   Correct.

9   Q.   And then you link with that information, your information

10  that child pornographers don't ever get rid of their collection

11  of child pornography, correct?

12  A.   They're not likely to get rid of it, that's correct.

13  Q.   Thereby making the assertion to the judge, it's unlikely

14  they would have gotten rid of this child pornography even if

15  they have gotten got new computers, what most likely happened

16  is they save their child pornography off the old computer and

17  put it on their new computer?

18  A.   Yes.

19  Q.   If you had one of these people's prior computers and had

20  searched their prior computer and it really was their computer

21  and found no child pornography whatsoever, then your basis for

22  probable cause in this search warrant affidavit would not hold

23  water, correct?

24  A.   I would disagree.

25  Q.   Why would you disagree?

79

1   A.   Because like I said, I didn't find anything relating the

2  Eberles to using that computer.

3  Q.   Okay.  My question is -- we'll take the Eberle's case as

4  an example.  If you really had the Eberle's computer from the

5  House of Television, then if that was really the evidence, your

6  basis for asking for establishing probable cause in this search

7  warrant affidavit would not be correct?

8  A.   Well, there's always the possibility that the pictures

9  would have been overwritten.

10  Q.   There's a possibility that pictures would have been

11  overwritten, okay.  When we were discussing your forensic

12  evaluation of the computer you got from the House of

13  Television, we discussed what reasonable conclusion would be

14  drawn if you assumed that you did in fact have the Eberle's

15  computer, but you did not find any of the Yahoo images on that

16  computer and indeed no child pornography whatsoever and under

17  those facts did you not agree that the reasonable conclusion to

18  be drawn would be those images had never been on the hard

19  drive, correct?

20  A.   Sure.

21  Q.   But you didn't include in this affidavit for the March,

22  2005 search of the March, 2005 computer, you put in information

23  about the investigation you did with linking George Eberle to

24   these Yahoo pictures, you included that, right?

25   A.   Yes.


                                80


1   Q.   But you didn't include in your affidavit the information

2   that you received from the House of Television, the computer

3   that George had possessed from January of 2004 through August

4   of 2004 -- had forensically examined the hard drive of that

5   computer, specifically looking for the photos that are at issue

6   in your search of the March computer, and you didn't find them,

7   you didn't put any of that information in your affidavit in

8   March?

9   A.   That's correct.

10   Q.   And you didn't put it in there why?

11   A.   Because, like I stated, I didn't find any information

12   whatsoever linking the Eberles to using that computer.  If I

13   had, I would have put it in there.

14   Q.   So the fact that the House of Television says this is the

15   computer that the Eberles rented, does not qualify as "any

16   information linking the computer to the Eberles?"

17   A.   I did not find on the computer hard drive anything

18  linking the Eberles to actually using it.  I didn't find a

19  picture, I didn't find their name.

20  Q.    You did have the manager of the House of Television

21  telling you this is the computer that the Eberles rented from

22  us?

23  A.    Yes.

24  Q.    And you don't have in your report anywhere anything about

25  you searching for the terms George and Alesha or glepa2001,

                                    81

1  correct?

2  A.    Yes, that's correct.

3  Q.    Detective Lynn, isn't it true that when you were looking

4  at the computer in September of 2004, that you started out just

5  looking for child pornography, correct -- that's what you were

6  interested in finding, right?

7  A.    The photos, yes.

8  Q    So you looked for those photos and you didn't find any,

9  correct?

10  A.    Well, in addition to those photos, you look at each photo

11  that comes up.  And I was not finding anything.

12   Q.   You didn't find any child pornography?

13   A.   That's correct.

14   Q.   And so when you got the computer, you did your data

15   carving, the first thing you're doing is looking to see is

16   there child pornography on this thing, right?

17   A.   I'm looking for all images.

18   Q.   You're looking for all the images and you look at all the

19   images to see if there's any child pornography, right?

20   A.   That's correct.

21   Q.   You did that and you didn't find any child pornography,

22   correct?

23   A.   That's correct.

24   Q.   So at that point in time you didn't care whether you

25   could develop forensic evidence to link the computer to George


82


1   or Alesha Eberle because there was no child pornography on this

2   thing anyway?

3   A.   No, I did care.

4   Q.   You cared enough to look to try and link to George and

5   Alesha Eberle, but when you decide that geez, the House of

6   Television gave me the wrong computer, you make no effort to go

7   back to the House of Television to try and locate the correct

8   computer, that's your testimony?

9   A.    My testimony is that I did not believe that it was the

10  right computer.  It could possibly be, it could possibly not.

11  At that time given everything I had, all the work, no, I didn't

12  go back and do a fishing expedition.

13  Q.    A fishing expedition, why would it be a fishing

14  expedition?

15  A.    Because we'd probably have to track down every computer.

16  Q.    Well, how about having the House of Television checking

17  their records to make sure they gave you the right one?

18  A.    I didn't do that.

19  Q.    That would have been a pretty short fishing expedition,

20  would it not?

21  A.    Could have been, could have not.

22  Q.    As a county detective tasked with investigating the

23  sexual exploitation of children, you believe that some computer

24  that the House of Television had has child pornography on it,

25  you think they gave you the wrong one, but then say the heck

1    with it, I'm not going to go through the effort of trying to

2    find what I believe to be child pornography on one of these

3    computers?

4         MR. TRABOLD:  Objection, asked and answered.

5         THE COURT:  It has been, last time.  I pick up this

6    stuff pretty quick, we're kind of rolling over the same ground.

7    Go ahead, you can ask it one more time.

8         MR. PATTON:  That's all right, I'm finished.  I have

9    to go over it again because I never know until afterwards

10    whether it's been picked up.

11         THE COURT:  All right, Mr. Hadley.

12                    CROSS-EXAMINATION

13    BY MR. HADLEY:

14    Q.    Good morning, Detective Lynn.

15    A.    Good morning.

16    Q.    My name is Attorney Michael Hadley, I represent Alesha

17    Eberle.  This is the first time we've met.

18    A.    Could you please speak up.

19    Q.    Detective Lynn, I want to pick up, please, where on the

20    last part, the House of Television search warrant, the part

21  Attorney Patton was just talking to you about.  Am I correct,

22  you would be liable for civil damages if you were to search

23  with a search warrant the wrong premises or the wrong computer,

24  you're conscious of that when you execute a search warrant,

25  correct?


84


1  A.    Yes.

2  Q.    And you realize your obligations as a sworn officer of

3  the law is the execution of a search warrant be upon for the

4  contents described in the warrant, correct?

5  A.    Yes.

6  Q.    And part of that is when you go to the House of

7  Television making sure you ascertain that the computer you

8  search is the right computer, correct?

9  A.    It's what I ask for, yes.

10  Q.    So the truth of it is when you went to get that computer,

11  you sincerely believed it to be the Eberle's computer, correct?

12  A.    At the time, yes.

13  Q.    Okay.  It's only because you found nothing that you think

14  it wasn't theirs?

15  A.   It's because I didn't find anything relating their names

16  or pictures knowing that they had a web cam.

17  Q.   But absent finding nothing, everything else you could

18  obtain said that was the Eberle's computer, correct?

19  A.   Repeat that, please.

20  Q.   Absent finding nothing, everything else that you could in

21  due diligence obtain said that was the Eberle's computer,

22  correct?

23  A.   That's what they gave me, yes.

24  Q.   In the early part of your testimony with Attorney

25  Trabold, you talked about your experience with child

85

1  pornographers, those who possess it, and you used the term

2  collector characteristics, correct?

3  A.   I believe Attorney Trabold used collector

4  characteristics.

5  Q.   Do you know what that term means?

6  A.   Yes.

7  Q.   I mean could we use that term as I cross-examine you, are

8  you comfortable with that term, collector characteristics?

9   A.   Pretty much, yes.

10  Q.   Okay.  That would be that these things are readily

11  accessible in a file that somebody could click on and view

12  easily, correct?

13  A.   That's not what collector characteristics --

14  Q.   What does that term mean to you?

15  A.   Collector characteristics -- particularly the preference

16  that they're collecting.  If they like blonds, if they like

17  under five.  If they like small body frames.  Those are

18  characteristics.

19  Q.   Okay.  It's the person's -- likes or dislikes?

20  A.   It's the collector's characteristics the person's

21  collecting.

22       THE COURT:  You're going too fast, Mr. Hadley, slow

23  down just a little bit.

24       MR. HADLEY:  I'm sorry.

25  BY MR. HADLEY:


86


1  Q.   What would be the term you would use for the manner and

2  the number in which somebody would collect child pornography?

3   A.    It could be characteristics of the people -- okay, people

4   who are collecting.  But the people who store them on devices

5   and stuff.

6   Q.   Did you tell us that your experience was that these are

7   normally numerous across the computer in your experience, child

8   porn images?

9   A.    A collector would have more than one picture.

10   Q.    More than one is two, are you talking normally dozens, in

11   your experience?

12   A.    The lowest number I've ever had was, I believe, 24 and

13   that was on a CD.  On a hard drive would be about 60.

14   Q.    And the most you ever had?

15   A.    Thousands.

16   Q.    Thousands, okay.  And isn't it true, Detective Lynn, that

17   the more that are possessed on a computer, the more likely

18   they'll remain accessible to Forensic Tool Kit later on,

19   correct?

20   A.    I don't believe number has anything to do with how

21   accessible it is.

22   Q.    So it doesn't matter, so one file has just as much chance

23   of being overwritten as a thousand files?

24   A.    No, in that case, that's correct.  In that case you're

25  correct.


87


1  Q.    You told this court that it was your understanding that

2  when computers are re-rented by the House of Television, that

3  they're wiped, was that the term you used, wiped?

4  A.    I don't believe I used a particular term.  I remember

5  Attorney Patton stating that it was reformatted.

6  Q.    Would you agree with me that there is a process in which

7  a hard drive can be completely cleared and made such that a

8  Forensic Tool Kit or forensic examination will be unable to

9  detect anything, correct?

10  A.    Yes, that's true.

11  Q.    What term do you want to use for that?

12  A.    I use secure erase.

13  Q.    All right, so you've got a secure erase on the one

14  extreme?

15  A.    On one extreme, yes.

16  Q.    That's writing everything over so it's perfectly secure

17  from any detective or whomever from looking at it, correct?

18  A.    Correct.

19  Q.   Now, short of that, a rental place could just reset the

20  computer so that a new owner could operate it with no obvious

21  remnants of a previous renter, correct?

22  A.   They could reset it, yes.  But a lot of people, like you

23  just said, if you may, a lot of people mix the terms wipe and

24  format and reset.

25  Q.   The computer that you searched in 2004 from the House of


88


1  Television, what was your understanding of what had been done

2  to it?

3  A.   I was originally told it was wiped, but I believe it was

4  reset.

5  Q.   Okay.  But you never believe there was a secure erase,

6  correct?

7  A.   No.

8       THE COURT:  What's the difference between wiping and

9  resetting?

10       THE WITNESS:  Resetting will go back to the original

11  state it was prior to the previous user.  And wiping you could

12  get rid of the operating system and stuff like that.

13    BY MR. HADLEY:

14    Q.    With either of those, your Forensic Tool Kit could do you

15    some good, correct?

16    A.    Yes, that's correct.

17    Q.    One of the things you told the court and included in your

18    search warrants was that people could store this stuff on

19    removable media, correct, child pornography?

20    A.    Correct.

21    Q.    We're talking USB drives, CD ROMs, floppy disks, correct?

22    A.    Correct.

23    Q.    While you had what you believe to be a good-faith basis

24    in September of '04 to search a computer that was returned from

25    the Eberles to the House of Television, can you explain to me


                                    89


1    why it is you never thought to get a search warrant for their

2    home to look for those things?

3            MR. TRABOLD:  Objection, relevance.

4            THE COURT:  What is the relevance?

5            MR. HADLEY:  It's relevant, your Honor, because we

6    believe that after the search of the House of Television, she

file:///A|/EBERLESP.TXT

7    concluded there's nothing there and that is based on what

8    you're going to hear that she knew she had the right computer.

9         THE COURT:  Overruled, go ahead ask the question

10   again.

11   BY MR. HADLEY:

12   Q.    After you go to the House of Television, why not go

13   search the home for removable media?

14   A.    Because I was informed by the OCY worker that they had

15   the computer, she did not tell me about any other removable

16   storage devices.

17   Q.    But it is your experience, as you put in your affidavits,

18   that child pornography can be stored in other forms?

19   A.    Can be, yes.

20   Q.    You asked for legal permission to search in both search

21   warrants for removable media, correct?

22   A.    Correct.

23   Q.    But you never, in at least as of September of '04,

24   decided to go to the Eberle's house, correct?

25   A.    No, I did not.

90

1   Q.   Okay.  I want to talk about March of 2005, please, which

2   was the forensic interview, I guess on the 24th of March, 2005,

3   and then your execution of a warrant four days later.  Before

4   you got your search warrant, you obviously did your interview,

5   which was not videotaped with Tiffany, correct?

6   A.   That's correct.

7   Q.   And you showed Tiffany the images from George's Yahoo

8   account, correct?

9   A.   Yes.

10  Q.   Did you bring any other child pornography images with you

11  to that interview with Tiffany?

12  A.   No.

13  Q.   You showed her only the pictures from George's account,

14  correct?

15  A.   Yes.

16  Q.   You brought those with you prior to hearing her answers

17  on the forensic interview, correct?

18  A.   Well, yes, it's a different location from where my office

19  is.  So I would have to take my files, yes.

20  Q.   Is it your testimony that you found it even remotely

21  believable that the girl who was in those images, which the

22  judge is going to see, was the same person who was right in

23  front of you?

24  A.   Yes, four years later when you have a girl crying, saying

25  that's me, yes.


91


1  Q.   Is it just that she cried that made you believe her?

2  A.   No, it was her body language.  Normally a girl wouldn't

3  identify herself as having naked pictures of her if it wasn't

4  her.

5  Q.   But isn't it true that her identification was only

6  possible with her acknowledging certain -- you called it

7  jewelry?

8  A.   She said in the pictures she said the girl is me.  She

9  gave us the description of the jewelry and that she was wearing

10  a bra in a couple of photos before she saw them.  Which led me

11  to believe this could be her.

12  Q.   Is it possible, because you had only brought the pictures

13  for George, because you had an ongoing investigation, isn't it

14  true that you actually -- were you leading her to say this was

15  her?

16  A.    Absolutely not.  Like I said, she gave me the description

17  before she saw the pictures, I didn't have to show her the

18  pictures.

19  Q.    Did you ever consider, as an investigative technique, to

20  verify Tiffany's credibility of presenting her with an array of

21  photographs and asking her if any of them were her?

22  A.    I would never ever show anyone child pornography unless I

23  had to by court.  I would not take in other pictures of

24  children and have her look at it.

25  Q.    You did not consider that?

92

1  A.    No.

2  Q.    Therefore, are you telling this court that you had

3  already in your own mind concluded that the pictures were

4  Tiffany before you showed them to her?

5  A.    Pretty much when she gave us the description of exactly

6  what was in the picture, that she was wearing a necklace, she

7  had a bra on, she had a ring on her left land, pretty much, not

8  many people would know that if that was in the picture unless

9  the picture was of them.

10  Q.    Is there something in your experience that is unique

11  about a woman wearing a bra?

12  A.    She's 12.

13  Q.    Is that unique in your experience?

14  A.    In a picture.  If you have a girl, we have a girl who

15  said they took pictures of me and in some of the pictures I had

16  bra on, some I didn't, she has a necklace and she was wearing a

17  ring on her left finger and when you look at the pictures --

18  some of the pictures she had on a bra, some she doesn't.  She

19  has a necklace and a ring on her left finger or the left hand.

20  Q.    So it is true, then, prior to Tiffany's identification,

21  you yourself had concluded that the photographs were Tiffany's?

22  A.    Most likely than not that they were her, yes.

23  Q.    What did you say, I didn't hear the answer?

24  A.    Most likely yes, they were her.

25  Q.    Well, against the backdrop of your fear of showing the

93

1  wrong child to another child, what level of confidence did you

2  feel you had to have before you would show those pictures to

3  Tiffany?

4   A.   I believe we actually covered the face and the chest area

5   first and then when she identified the items, we showed her the

6   picture.  We showed her the head before we showed her the

7   chest, but she positively identified.

8   Q.   I'm sorry, you showed her what, what did you show her

9   first?

10   A.   In the picture, like I said, we covered part of the body.

11   We didn't flash the picture in front of her.

12   Q.   Okay, let me get this right.  You covered part of the

13   body show --

14   A.   Show the chest.

15   Q.   Show just the chest?

16   A.   No, we covered the chest.

17   Q.   And showed just the head?

18   A.   The head with the necklace and the ring.

19   Q.   And that's all you gave Tiffany to go on was her face?

20   A.   After she said it was her, we removed the paper and she

21   said yes, definitely.

22   Q.   Of course we know now that's not the truth?

23   A.   That's what she's saying now.

24   Q.   You don't disagree with her now, do you -- do you have

25   any evidence to disagree that's not Tiffany in the pictures?

94

1  A.   I'm sorry.

2        MR. TRABOLD:  What's the relevance of this, we're

3  here to --

4        THE COURT:  Sustained.

5        MR. HADLEY:  Thank you, your Honor, no further

6  questions.

7        THE COURT:  Anything further, Mr. Trabold?

8        MR. TRABOLD:  Just briefly, your Honor.

9                REDIRECT EXAMINATION

10  BY MR. TRABOLD:

11  Q.   Now, did you conclude after you got the computer, the

12  first computer now in 2004, the information you had from the

13  House of Television -- did you think they had done, I think

14  your term was a secure erase or did you think it was a step

15  less than that?

16  A.   I think it was a step less than that.

17  Q.   Would it have been, and pardon my ignorance of computer

18  terms, but the fact that there was data or material on the hard

19  drive unrelated to the Eberles, did that cause you to conclude

20   that something less than a wipe or a total erase had been done?

21   A.   Yes, that's correct.

22   Q.   Closer perhaps to a reformatting, I think is the term?

23   A.   Closer to that, yes.

24   Q.   And the fact that the computer had only been reformatted,

25   did that even more cause you to conclude that maybe you didn't

95

1   have the right computer because there's nothing from the

2   Eberles on there?

3   A.   Could be, yes.

4   Q.   Because the entire hard drive wasn't wiped out?

5   A.   It wasn't blank.

6   Q.   Would that have led you to the conclusion that if Eberle

7   information had at one time been on this computer, it would

8   still be there?

9   A.   Yes.

10   Q.   Now, with regard to your report, I believe it's from

11   March 28th of '04, the defense cross-examined you on --

12   A.   I'm sorry, March 28th of when?

13       THE COURT:  '04.

14        THE WITNESS:  There is no March 28th of '04, I have

15   a March 28th of '05.

16   BY MR. TRABOLD:

17   Q.    Hold on, September 28th of '04.  You were cross-examined

18   with regard to a data entry for the 28th of September, '04?

19   A.    Yes.

20   Q.    The entry you put in there is essentially four lines of

21   material?

22   A.    That's correct.

23   Q.    Was that intended to be the entirety of what you

24   discovered or what you did with regard to the Eberle case?

25   A.    No, it was for me, I know what I did.  And at that point


                              96


1   I wasn't going any further with the investigation.

2   Q.    This is a summary?

3   A.    Yes.

4   Q.    Now, if you had included the information in the second

5   search warrant about the fact that you had looked at the first

6   computer and found nothing, is that all the information you

7   would have included or would you have included additional

8   information?

9   A.   I would have included the fact that the House of

10  Television told me that they either wiped or reset the computer

11  and that absolutely nothing relating to the Eberles was found

12  whatsoever.  No screen names, no images of them, their

13  children, nothing.

14  Q.   Would you have included the indication from the House of

15  Television that the computer had been re-rented?

16  A.   Yes, I would have.

17  Q.   With regard to why no FTK report was generated for your

18  first search.  Are you in the habit of generating such reports

19  for cases that are not going to go forward with prosecution?

20  A.   If there's nothing found, no, I don't generate a report.

21  Q.   Would there be any reason for you to generate or, I don't

22  even know if generate is the correct term, but compile an FTK

23  report for a case that's not going to move forward?

24          THE COURT:  What does FTK stand for for the record?

25          THE WITNESS:  Forensic Tool Kit.


97


1  BY MR. TRABOLD:

2  Q.   Just so we're clear for the record, Forensic Tool Kit is

3  just the software that you use to examine a hard drive?

4  A.   Yes, it's the software created by Access Data.

5  Q.   Are you in the habit of doing that for cases that aren't

6  going to move forward for prosecution?

7  A.   No, I don't generate a report unless I find something on

8  the computer.

9  Q.   Now, with regard to this whole issue of your discussion

10  of the 2001 series of photographs with the victim, Tiffany

11  Smith.  Prior to showing her the pictures, did you provide her

12  a description of what the pictures were?

13  A.   No, she provided that to me.

14  Q.   How did your discussion with her begin with regard to

15  these pictures?

16  A.   I asked her if she could tell me about the pictures that

17  were taken.

18  Q.   And you only discussed this with her after she revealed

19  in the forensic interview that pictures had been taken of her?

20  A.   Yes.

21  Q.   And did the information that she told you about the

22  pictures, did that information occur prior to her seeing any of

23  them?

24  A.   Yes.

25  Q.   Did the information that she provided to you about the

98

1  sum and substance of the pictures correspond to what was

2  depicted in the actual pictures?

3  A.   Yes.

4  Q.   And Tiffany was three or four years older at the point in

5  time when you interviewed her from when the pictures would have

6  been taken?

7  A.   Yes.

8  Q.   And based on your experience, was her emotional reaction

9  consistent with somebody that had been victimized?

10  A.   Yes.

11  Q.   And did she provide you more information than to just say

12  yes, that's me?

13  A.   She said that's me and that they took the pictures.

14  Q.   But I mean did she provide any descriptive detail?

15  A.   About the items she was wearing?

16  Q.   Correct.

17  A.   Yes.

18  Q.   Would you agree with me it was more than just somebody

19  saying yeah, that's me, and those are the pictures they took of

20  me?

21  A.   Yes.

22  Q.   Prior to her telling you about the jewelry and the bra,

23  did you reveal those details to her at all?

24  A.   No.

25       MR. TRABOLD:  Nothing further, your Honor.


                              99


1              RECROSS-EXAMINATION

2  BY MR. PATTON:

3  Q.   Mr. Trabold asked you some questions about if you would

4  have put in your affidavit in March of 2005 the fact that you

5  had searched the computer from the House of Television about

6  what other evidence or what information you put in the

7  affidavit, do you recall that?

8  A.   Yes.

9  Q.   I believe you testified that you would have in the March,

10  2005 affidavit, put in the fact that you searched the computer

11   from the House of Television for these specific images from

12   Yahoo and did not find them, nor any child pornography, you

13   would have also put in that the computer had been reformatted

14   and re-rented, correct?

15   A.   I would also put that I found absolutely no information

16   pertaining to the Eberles found on the computer, like I've

17   said.

18   Q.   But you had also agreed with Mr. Trabold when he asked

19   you about the fact that it was being reformatted, would not

20   have prevented you from finding those images had they actually

21   been there or would not have prevented you from finding

22   evidence linking the computer to the Eberles, correct?

23   A.   Can you repeat that.

24   Q.   Your affidavit itself states that through the forensic

25   software and with your forensic training, you can recover


100


1   deleted files, correct?

2   A.   Correct.

3   Q.   So the fact that the files may have been deleted wouldn't

4   have affected whether or not you felt you could retrieve them

5    using forensic software, correct?

6    A.    If they had been written over or had a better wiping

7    system at the time.

8    Q.    Well, I'm not talking about what could have been, I'm

9    talking about what the House of Television actually did?

10    A.    When I spoke with them originally, they used the term

11    wipe.  Wipe could be anything, wipe could be wiping where it

12    would be overwritten or not.

13    Q.    Ma'am, you've already testified that when you actually

14    looked at the hard drive, you quickly concluded that it hadn't

15    been completely wiped?

16    A.    That's correct.

17    Q.    So you wouldn't have put in your affidavit in March, 2005

18    that the House of Television wiped off all the information,

19    would you have?

20    A.    I would have put that they did some sort of resetting,

21    reformatting or something, because it was re-rented.

22    Q.    Well, let me put it to you this way.  Before you ever got

23    the computer from the House of Television, you knew it had been

24    reformatted and re-rented, correct?

25    A.    I knew something had happened to it.

1  Q.   But even after you got that information, you went to a

2  judge and said I still have probable cause to believe that

3  these images are on there and I can find them, correct?

4  A.   I did not know exactly what was done to it.

5  Q.   Well, after you got the computer, you talked to Mr.

6  Trabold about the things you found, all the stuff you found

7  which led you to believe that it hadn't been completely wiped

8  or secured enabled in your terms or whatever you call it?

9  A.   Secure erase.

10  Q.   Secure erase?

11  A.   Yes.

12  Q.   You knew that hadn't happened?

13  A.   That's correct.

14  Q.   You actually found data in the unallocated space,

15  correct?

16  A.   That's correct.

17  Q.   So you knew whatever the House of Television did to

18  prepare for re-renting, didn't make the information in the

19  unallocated space unavailable to you through the use of

20  forensic software?

21  A.   That's correct.

22  Q.   May I presume you would have told the judge that in your

23  affidavit?

24  A.   Yes.

25  Q.   But you said you included the fact in the affidavit the

102

1  fact that the computer had been re-rented, is that correct?

2  A.   Yes.

3  Q.   Did you ever check and find out how long the computer had

4  actually been re-rented for?

5  A.   You asked me that before, the answer is still no.

6  Q.   So you would have put in there that the computer had been

7  re-rented, but you had no idea how long it had been re-rented

8  for?

9  A.   No.

10  Q.   Well, would you agree that the length of time it had been

11  re-rented, would be relevant to the probability that images in

12  the unallocated space would have been overwritten?

13  A.   Could be.

14  Q.   The longer it's been re-rented, the higher the

15  possibility that data that's in the unallocated space would

16  have been overwritten, correct?

17  A.   That could be.

18  Q.   The shorter period of time, the less likely?

19  A.   That could be, depends on how much activity the people

20  use on the computer.

21  Q.   Regardless of the volume of activity a particular person

22  uses, whatever volume that is, the longer they do it, the more

23  they're going to overwrite, correct?

24  A.   Yes, that's correct.

25  Q.   And you said that you would put in the affidavit the fact

103

1  that you didn't find anything linking the computer to the

2  Eberles?

3  A.   I would have, yes.

4  Q.   Would you put in the affidavit that the House of

5  Television was told turn over the computer that the Eberles

6  rented and that they gave you that computer?

7  A.   Yes.

8  Q.   And would you have put into your affidavit, may I

9   presume, the fact that while you thought the House of

10  Television gave you the wrong computer, you never took any

11  steps whatsoever to try and locate the correct computer from

12  the House of Television, would you have put that in your

13  affidavit?

14  A.   I probably would have, yes.

15       MR. PATTON:  Those are my questions, your Honor.

16       THE COURT:  Okay.  You get one short shot at it

17  here.

18       MR. HADLEY:  Three short questions, your Honor.

19              RECROSS-EXAMINATION

20  BY MR. HADLEY:

21  Q.   Detective Lynn, in September of 2004, the House of

22  Television hard drive, the protocol is you make a mirror of

23  that and then you work from the mirror, correct?

24  A.   Yes.

25  Q.   Do you still have that mirror?


104


1   A.   No, I don't.

2   Q.   You, like the rest of us, your memory fades with time,

3  correct?

4  A.   Yes.

5  Q.   And that's why you make reports to refer to later,

6  correct?

7  A.   Yes.

8       MR. HADLEY:  That's all I have, judge, thank you.

9       THE COURT:  Thank you, you're excused.

10      MR. HADLEY:  May it please the court, your Honor,

11  are we going to need her testimony for the motion in limine?

12      MR. TRABOLD:  I don't know that we necessarily need

13  her to introduce the chats into evidence.

14      THE COURT:  I don't see the purpose in examining her

15  about the chats.  I mean I have exemplars in the motion.  The

16  problem is mine, I'm not sure what you're asking me, what do

17  you want me to do?

18      MR. HADLEY:  I guess I want to make sure that before

19  you excuse her and she leaves, nobody needs her for the motion

20  in limine.

21      THE COURT:  Well, do you need her?

22      MR. HADLEY:  I don't need her.

23      THE COURT:  Mr. Patton, do you need her?

24          MR. PATTON:  I'm not a party to that motion.

25          THE COURT:  You don't need her then.


                              105


1          MR. HADLEY:  I don't need her as long as the whole

2   chats will come in for your consideration.

3          THE COURT:  What do I have right now, just excerpts

4   of them, is that it?

5          MR. TRABOLD:  Correct.

6          THE COURT:  Well, that's up to you folks.

7          MR. TRABOLD:  I don't think we need her for that.

8          THE COURT:  I don't, either.  So after that long

9   discussion, you're free to step down.

10          THE WITNESS:  Thank you.

11          MR. TRABOLD:  Nothing further from the government,

12   your Honor.

13          THE COURT:  Can we get a little time check here.

14   What do you figure there, Mr. Patton?

15          MR. PATTON:  We'll be here a good part of the

16   afternoon, your Honor.

17          THE COURT:  Okay, Mr. Patton.

18          MR. PATTON:  Your Honor, we would call Carl

19   Buckshaw.

20          MR. TRABOLD:  Your Honor, can I have an offer of

21   proof as to what the relevance is of this testimony?

22          MR. PATTON:  Your Honor, Mr. Buckshaw is going to

23   testify about the fact of renting a computer from the House of

24   Television.  Then we'll put on the testimony of an individual

25   who did a forensic evaluation of that hard drive and explain to

106

1   your Honor what kind of information is available on that hard

2   drive.

3          THE COURT:  I'm sorry, tell me again, you say he's

4   going to talk about renting a computer.  Tell me again, I

5   didn't get it?

6          MR. PATTON:  Carl rented a computer from the House

7   of Television.  Which I then took and I had our in-house

8   computer person run Forensic Tool Kit on the hard drive of

9   that.  I'm going to have that person testify to explain to you

10   and show to you the volume of information that's available on

11   those hard drives.  Even after they're prepared for re-renting

12    and are re-rented.  To argue about the reasonableness of the

13    conclusions drawn by Detective Lynn.

14           THE COURT:  All right.

15           MR. TRABOLD:  What is the relevance of that, the

16    only thing that is relevant is what happened to the Eberle's

17    computer and hard drive.  Not what examination could be done on

18    a hard drive rented by somebody working for the Federal

19    Defender's office four years after the fact, or two years after

20    the fact, whatever it may be.

21           THE COURT:  I mean, I'm willing to think about this

22    some more, but you've got to run this relevance by me again?

23           MR. PATTON:  Your Honor, Detective Lynn is

24    testifying that she did this search of the hard drive, but she

25    doesn't have any reports regarding how she did that and the


                                107


1    information that was developed.  And then has testified about

2    the conclusions she drew about the hard drive, and about

3    whether or not the Eberles had possessed it.  What I intend to

4    do is put on actually two different people --

5           THE COURT:  She said she didn't find any evidence of

6    pornography or that it was the Eberle's computer, as I

7    remember?

8            MR. PATTON:  That's correct.  It's our position,

9    number one, she never looked for anything linking it to the

10   Eberles because she didn't care to link it to the Eberles

11   because the House of Television told her it was the Eberle's

12   computer, she searched it for child pornography and didn't find

13   any child pornography.  She just had no reason to try and link

14   it up.  But what I want to impress upon your Honor and show

15   your Honor is the volume of information that are still

16   available on these hard drives and the reasonableness of

17   Detective Lynn's position that I searched this hard drive, came

18   up with all this data, did not find the images that I'm looking

19   for or indeed any child pornography.  And then say well, I

20   didn't mention that to the judge later on because it wasn't

21   relevant.  I believe I have the right to develop the evidence

22   to support that.  Because right now you don't have, nobody has

23   been able to see what it is she pulled up during her

24   examination because she didn't keep any reports, she didn't run

25   and reports of it.

1          THE COURT:  All right.  I'll tell you what.  I'm

2   going to take the testimony.  And then I'm going to determine

3   whether it's relevant at some point.  But how long is this

4   going to take us?

5          MR. PATTON:  Mr. Buckshaw will be about five

6   minutes.  All I want to show him is the rental agreement that

7   he signed and they delivered to him.

8          THE COURT:  Would the government just stipulate to

9   what he's going to say?

10         MR. TRABOLD:  Yes, if you're going to hear the

11   testimony --

12         THE COURT:  Why don't you just put on the record

13   what this witness is going to say, then we'll see if he agrees

14   with it.  That will be the shortest testimony anybody has given

15   today.  Go ahead.

16         MR. PATTON:  Mr. Buckshaw will testify that he went

17   to the House of Television, said he wanted to rent a computer,

18   did all the paperwork and had the computer delivered to his

19   house.  To actually rent a computer from the House of

20   Television, they actually have to bring it to your residence,

21   they won't just let you carry it out the door.  Once that

22  happened, Mr. Buckshaw gave the computer to me, I brought it

23  back to our office.  And then Mark Ganley, who is our computer

24  system analyst, took the hard drive out of that computer and

25  ran Forensic Tool Kit.


109


1           THE COURT:  All right, so stipulated.

2           MR. TRABOLD:  I have no reason to dispute that, your

3  Honor.

4           THE COURT:  Thank you, sir, you're excused.

5           MR. PATTON:  Your Honor, I have testimony to put on

6  from Craig Culhane, who is the manager of the House of

7  Television, who interacted with Ms. Lynn.  And Will Nieder, for

8  lack of a better way to put it, is their tech person, who can

9  explain exactly what it is that they do --

10          THE COURT:  They're here and ready to go now?

11          MR. PATTON:  Yes.

12          THE COURT:  All right, you can call them after we

13  take a short recess.

14          (Recess from 11:41 a.m.; until 11:50 a.m.)

15          THE COURT:  All right, Mr. Patton.

16          MR. PATTON:  Your Honor, we'd call Mr. Craig

17  Culhane.

18          THE COURT:  Come on up here, Mr. Culhane.  Spell

19  your last name for my court reporter?

20          THE WITNESS:  C-u-l-h-a-n-e.

21              CRAIG CULHANE, DEFENSE WITNESS, SWORN

22                  DIRECT EXAMINATION

23  BY MR. PATTON:

24  Q.    Mr. Culhane, where do you work?

25  A.    House of Television, Corry, Pennsylvania.


                                110


1  Q.    What type of business is that?

2  A.    It's a rent to own business.

3  Q.    You guys rent computers?

4  A.    Yes.

5  Q.    In the rent to own business, whether you're renting

6  computers or any other items, is it important for you as a

7  business to be able to keep track of the items you are renting?

8  A.    Absolutely.

9  Q.    Does your business have systems set up to help you track

10  the different items that you rent?

11  A.  Yes.

12  Q.  With regards to computers, could you just give us a

13  general idea of the systems you guys use to keep track of your

14  rental units?

15  A.  Every unit, regardless of whether it's a computer or a

16  couch or a TV, has got a separate stock number on it.  Which

17  when we enter them into our system, the serial number goes in

18  and then you put the stock number on it.  So everything has got

19  a certain number on it.  We do inventory twice a week.

20  Q.  If you rent an item to an individual and they at some

21  point bring the item back, when the item is brought back to

22  you, is there anything you guys do to check to make sure you're

23  getting the right item back?

24  A.  Yeah, I mean, I'd say 99 out of a 100 we know what the

25  item is.  But we always check stock numbers.


111


1  Q.  Every time something gets returned, you guys check the

2  stock number against your records to make sure the person who

3  rented this item is bringing you back the item he rented from

4  you?

5  A.    Yes.

6  Q.    When you guys get computers returned to you, what steps

7  do you take to prepare the computer for re-rental?

8  A.    That's really -- what kind of computer it is is really

9  going to depend on what I will do to it.  Some computers have

10  disks for restore, some are self-restored disks.  If it's a

11  machine that has a disk, it could be one disk, two disks, three

12  disks.  You turn the machine on, flop the disk in, hit the

13  restart button, follow the on-screen directions.  Like I said,

14  it might be one disk, it might be three.  If it's a

15  self-restore, you press the power button on the machine, start

16  tapping F10, and then it will walk you right through it.

17  Q.    Are you yourself any kind of expert on computers and how

18  they work?

19  A.    Absolutely not, no.

20  Q.    Is it fair to say that you have been given instructions

21  on steps to follow to restore the computer and you just follow

22  those instructions?

23  A.    Yes.

24  Q.    I want to talk to you about a computer that was rented to

25   George Eberle.  Do you recall back in the year 2004 renting a

112

1   computer to Mr. Eberle?

2   A.    Back then, yeah.

3   Q.    At some point in time were you contacted by Detective

4   Jessica Lynn from the Erie County detectives?

5   A.    Yes.

6   Q.    Did she ask you about this particular computer?

7   A.    What the conversation was, I mean, I don't recall.

8   Q.    Could you just give the purpose of why she was calling

9   and the actions you took in response to her call?

10   A.    I have a search warrant for a certain computer, which I

11   had to get from somebody who had it on rent and gave it to her.

12   Q.    She says I have a search warrant for a computer?

13   A.    Yes.

14   Q.    And was it identifying what computer the search warrant

15   was for?

16   A.    Yes.

17   Q.    And is it accurate to say that was the computer that

18   George Eberle had rented from your store?

19   A.   Yes.

20   Q.   Now, at that point in time when you had contact, did you

21   have that computer in your store?

22   A.   No.

23   Q.   Were you directed to take steps to get it back into your

24   store?

25   A.   I believe so, yes.


113


1   Q.   Did you take steps to get it back into your store?

2   A.   Yes.

3   Q.   Let me ask you this.  How did you make sure that the

4   computer you were going to get back and turn over was the right

5   computer?

6   A.   Got into my system, found out what the stock number was

7   on the computer that Mr. Eberle had.  Got in, did a search to

8   see who had it now.  I found out who had it, called that person

9   and got my computer.

10   Q.   Once you got the computer back, did you do anything to

11   it?

12   A.   No.

13  Q.   Did you turn it over to Detective Lynn?

14  A.   I'm pretty sure it was her.  I turned it over to

15  somebody.

16  Q.   After you had given the computer to whatever law

17  enforcement officer who wanted it, as a result of the search

18  warrant, were you ever contacted and asked are you sure you

19  gave us the right computer?

20  A.   Not that I recall, no.

21  Q.   Were you ever in any way contacted by phone or in person,

22  ever asked or told I think you gave us the wrong computer,

23  could you double check to make sure you gave us George Eberle's

24  computer?

25  A.   I don't believe I was ever asked that either, no.


114


1  Q.   Are you confident that you gave law enforcement the

2  computer that George Eberle rented from your store?

3  A.   I'm a hundred percent sure.

4  Q.   No question at all in your mind?

5  A.   No.

6  Q.   Mr. Culhane, I want to show you what I have marked as

7   Defendant's Exhibit D, it's two pages and ask you to take a

8   look at it?

9   A.   Okay.

10   Q.   Do you recognize those as records coming from your store?

11   A.   Yes.

12   Q.   If I could have those back, I'll put them on the screen.

13   If you watch, it will come up your screen, okay.  In this first

14   page of the exhibit, is that an item history report for the

15   computer that George Eberle rented from you guys?

16   A.   Yes.

17   Q.   And is it accurate to say that that report basically

18   documents all the different people who have rented that

19   particular computer from your store?

20   A.   Yes.

21   Q.   And is this based on that stock number you previously

22   testified to?

23   A.   Yes.

24   Q.   Do you see where I'm pointing here on the date of

25   8/20/04, it says "item was terminated, reason, return with

115

1    balance, okay to re-rent?"

2    A.    Yes.

3    Q.    Does that represent George Eberle returning the computer

4    to your store --

5    A.    Yes.

6    Q.    On August 20th of 2004.  According to this, when was the

7    computer re-rented then?

8    A.    On the 26th of August, 2004.

9    Q.    To a Ms. Wanda Urban?

10    A.    Yes.

11    Q.    When was that gotten back from Ms. Urban?

12    A.    The 3rd of September, 2004.

13    Q.    Would that have been when you went back and got the

14    computer from Ms. Urban because you had to turn it over?

15    A.    Yes.

16    Q.    Now, the report indicates that it was loaned to a Jim

17    George, could you just explain why that's there?

18    A.    With our system I can't just give something out, I have

19    to have it accounted for.  So the easiest way for me to do that

20    is I pick somebody who had a computer already, used his name

21    and loaned it to him, so in my inventory that item was

22    accounted for.

23  Q.    So is it accurate to say that you didn't really give it

24  to Jim George?

25  A.    Not until after.


                                    116


1  Q.    Okay.  I want to show you the second page of this

2  exhibit, is this another record from your store?

3  A.    Yes.

4  Q.    With regards to this particular computer that we've been

5  talking about?

6  A.    Yes.

7  Q.    Does that detail the rental of the computer to this Wanda

8  Urban?

9  A.    Yes.

10  Q.    Is it accurate to say that Wanda Urban is the client or

11  customer who got the computer after George Eberle returned it

12  to your store?

13  A.    Yes.

14  Q.    How long did Ms. Urban have this computer?

15  A.    Looks like a week.

16  Q.    From?

17  A.   From -- excuse me, the 26th of August to the 3rd of

18  September.

19  Q.   So nine days?

20  A.   Yes.

21  Q.   After you retrieved it from Ms. Urban, you turned it over

22  to law enforcement?

23  A.   Yes.

24  Q.   With regard to your putting in Jim George had the

25  computer, you said you have to put something in your records;

117

1  is it possible that you did something similar to that earlier

2  in time with this computer so you just got messed up as to

3  which one George Eberle had rented?

4  A.   No.

5  Q.   You're absolutely certain this was the computer George

6  Eberle rented?

7  A.   One-hundred percent certain.

8  Q.   And that's the one you gave to whatever law enforcement

9  officers came to pick it up?

10  A.   Yes.

11  Q.   At some point was the computer returned to you?

12  A.   I believe it was late September.

13  Q.   Did the computer just go back into your guys stock?

14  A.   Yeah, I took it out of loan, in fact, Jim George, the guy

15  who I used, this is going back -- I rent so many computers I'm

16  trying to think.  I believe that Jim George had a computer like

17  the one in question and wasn't happy with it.  So I believe I

18  swapped him out with that one after I got it back.

19  Q.   If, after the law enforcement people had picked up this

20  computer, if they had contacted you and asked you if you were

21  sure that you had given them the computer that George Eberle

22  rented from your business, what would you have told them?

23  A.   You have the computer that George Eberle rented from me.

24  Q.   No question?

25  A.   No.


118


1        MR. PATTON:  Those are my questions, your Honor.

2        THE COURT:  All right.  Do you have any questions of

3   this gentleman?

4        MR. HADLEY:  No, sir.

5    THE COURT:  All right.  Mr. Trabold.

6              CROSS-EXAMINATION

7  BY MR. TRABOLD:

8  Q.    Do you have the exhibit there in front of you?

9  A.    I got copies with me.

10  Q.    Just so I'm clear on what we're talking about here, if

11  you have it with you.  Does that say on January the 21st of

12  2004 was the first time the computer we're talking about was

13  rented to Mr. Eberle?

14  A.    Yes.

15  Q.    And then it indicates that there was some service done to

16  the computer?

17  A.    Yes.

18  Q.    Do you know what the service was?

19  A.    The problem was it will not read disks.  He comments when

20  he fixed it, replaced CDRW and installed the Barney software --

21  Q.    Can you say that again, the last part about the software,

22  I didn't hear what you said?

23  A.    It says replaced CDRW with an R-tech 52 by 24 by 52, and

24  installed the Nero-Barney software.

25  Q.    Do you have any idea what that means?

1    A.    A Nero is for burning music, burning CD's, as far as I

2    know.  I'm not really good with all that software, I know how

3    to restore them, I know how to maybe change a drive, that's

4    about it.

5    Q.    Does that have anything to do with the hard drive, that

6    you can tell on there?

7    A.    No.

8    Q.    And just so I'm clear, this document that you have here

9    isn't on its face one-hundred percent accurate, correct,

10   because you didn't in fact loan the item out to Jim George, you

11   gave it to law enforcement?

12   A.    True.

13   Q.    And is there something that prevents you from typing in

14   here item given to law enforcement?

15   A.    This was our old software -- I probably made a note that

16   it was given to law enforcement.  But I don't believe I could

17   have typed it anywhere in here, that I physically typed it into

18   that software.

19   Q.    And do you agree with me that the purpose of keeping

20  records like this is so you can know many years into the past

21  what it is that you actually did with the computer, correct?

22  A.   Uh-huh.

23  Q.   And this record is not accurate?

24  A.   I would say that the record is accurate.  I mean I know

25  where that computer went, it's my store.


                                120


1  Q.   Well, it didn't go to Jim George, though, on September 3,

2  2004?

3  A.   Right.

4       MR. TRABOLD:  Okay.  Nothing further.

5       THE COURT:  Anything else of this gentleman?

6       MR. PATTON:  Yes, your Honor.

7              REDIRECT EXAMINATION

8  BY MR. PATTON:

9  Q.   When you guys were contacted from law enforcement, years

10  hadn't gone by between the time George had returned that

11  computer to you and the time law enforcement contacts you, is

12  that correct?

13  A.   Correct.

14  Q.   It was less than two weeks?

15  A.   The item was terminated on the 20th of August of 2004.

16  And loaned to Jim George on 3rd of September of 2004, so it was

17  within two weeks.

18  Q.   And at that point in time is there any question in your

19  mind that you had given law enforcement the correct computer?

20  A.   No.

21  Q.   At this point in time is there any doubt in your mind

22  that you gave law enforcement the correct computer?

23  A.   No.

24  Q.   You would have told that to law enforcement if they would

25  have asked you those questions?


121


1  A.   Yes, I would have.

2       MR. PATTON:  That's all.

3       THE COURT:  Thank you, Mr. Culhane, you're excused,

4  sir.  All right, we're in recess until 1 o'clock.

5       (Luncheon recess from 12:10 p.m.; until 1:10 p.m.)

6       THE COURT:  All right, Mr. Patton.

7       MR. PATTON:  Your Honor, we'll call Mr. Will Nieder,

8  he's from the House of Television.

9      THE COURT:  Would you spell your name for my court

10  reporter?

11      THE WITNESS:  My name is William G. Nieder,

12  N-i-e-d-e-r, Jr.

13          WILLIAM NIEDER, DEFENSE WITNESS, SWORN

14              DIRECT EXAMINATION

15  BY MR. PATTON:

16  Q.   Sir, do you pronounce your last name Nieder?

17  A.   Nieder.

18  Q.   And, Mr. Nieder, where do you work?

19  A.   House of Television.

20  Q.   What does that particular business do?

21  A.   We are a rent to own business with 12 locations.

22      THE COURT:  Keep your voice up, please.

23  BY MR. PATTON:

24  Q.   What location do you work at?

25  A.   I work at the corporate office.


                    122


1  Q.   And what do you do there?

2   A.   I am the IT manager, I work on computers and take care of

3   all computer systems for the company.

4   Q.   Are you familiar with the steps your business takes when

5   computers are returned from rental to prepare those computers

6   for re-rental?

7   A.   Yes.

8   Q.   What do you guys do to those computers?

9   A.   When we get the computer back in, the store manager or

10   whoever is in the store, is instructed to do a format and

11   restore.

12   Q.   A format and restore?

13   A.   Yes.

14   Q.   Would you explain what a format and restore is?

15   A.   Formatting is the cleaning off the drive and restoring it

16   back to factory settings just like the computer was when it was

17   purchased.

18   Q.   When you guys do the reformatting and restoring, does

19   that take all the information that's on the hard drive of that

20   computer when it's brought back to your store and physically

21   remove all of that information from the hard drive?

22   A.   It does remove it but it doesn't completely delete it.

23   Q.   Is it accurate to say that the next person who rents the

24  computer wouldn't be able to access that?

25  A.   No, they would not.


                                123


1  Q.   Is it possible to access some of that information using

2  forensic software programs?

3  A.   Programs and such, yes.

4  Q.   Does your business use programs that actually completely

5  wipe hard drives such that no information that was on the hard

6  drive at the time that the computer was returned --

7  A.   No, it's writing one and zeros to the drive and we don't

8  do that.

9  Q.   Were you ever contacted by Detective Jessica Lynn or

10  anyone from Erie County law enforcement to ask you questions

11  about the processes your business uses in preparing the

12  computers for re-rental?

13  A.   Just Mr. Townley.

14  Q.   A computer was taken from your store in Corry pursuant to

15  a search warrant, I want to ask you about that computer.  Do

16  your records indicate that some service was done to that

17  computer while Mr. Eberle had the computer?

18  A.   Yes.

19  Q.   What was done?

20  A.   We replaced a CD drive, the CD burner and reloaded the

21  software.

22  Q.   When was that done?

23  A.   1/28/04.

24  Q.   So when you say replaced the CD drive, you mean you're

25  physically taking the physical CD drive that you actually place


124


1  a CD into and putting a new one in, is that correct?

2  A.   Yes.

3  Q.   And then you have to ask the appropriate software to run

4  that particular CD?

5  A.   Right, we add the driver and also the software for

6  burning CD's.

7  Q.   When you add that software to the operating system so you

8  can run the CD drive, would that overwrite like any pictures

9  that Mr. Eberle would have saved onto his hard drive?

10  A.   No, it's just a driver to make the device run.

11  Q.   So if Mr. Eberle had had pictures saved onto his hard

12   drive, placing this new software on it would not have any

13   impact on those pictures?

14   A.   No.

15        MR. PATTON:  Those are my questions, your Honor.

16        MR. HADLEY:  Nothing, your Honor, thank you.

17                 CROSS-EXAMINATION

18   BY MR. TRABOLD:

19   Q.   Sir, is it accurate to say you did not actually do the

20   format and restore on the Eberle's computer in this case?

21   A.   That's correct, it was done in the store.

22   Q.   And that's just random procedure, you don't do the

23   formatting and restores for any of the computers, that's

24   something done by individual store employees?

25   A.   Most of the time.  If they come in for service, then I'm


                             125


1   required to restore them before they go back.  Only if they're

2   in for service.

3   Q.   And the goal, obviously, of the format and restore is to

4   have renter B not be able to access anything that renter A had

5   on the computer, it's to give the new renter a clean slate?

file:///A|/EBERLESP.TXT

6   A.   Yes.

7   Q.   And you would agree with me, though, by virtue of being

8   an IT person, that computers, like most other consumer goods,

9   can be somewhat temperamental; I mean you can get one computer

10  hard drive for one computer generally that can operate like a

11  charm and another one might be just a piece of junk or a lemon?

12  A.   Sure.

13  Q.   That's just like cars, you could get the same model and

14  make of cars, one would be great, another one would be a piece

15  of junk?

16  A.   Yes.

17  Q.   That definitely holds true for computers?

18  A.   Yes.

19       MR. TRABOLD:  Nothing further, your Honor.

20       THE COURT:  Anything else?

21       MR. HADLEY:  I just have one question, your Honor.

22       THE COURT:  All right, go ahead.

23              CROSS-EXAMINATION

24  BY MR. HADLEY:

25  Q.   Sir, do you guys ever provide any of your stores with

1   software to do a secure erase of a hard drive?

2   A.   No.

3        MR. HADLEY:  Thank you.

4        THE COURT:  Thank you, sir.

5        MR. PATTON:  Could Mr. Culhane and Mr. Nieder be

6   excused?

7        THE COURT:  Yes, they sure are, thank you.

8        MR. PATTON:  We call Mark Ganley.

9        THE COURT:  Before you get all the way up here, is

10  this the gentleman who's testifying pursuant to your offer of

11  proof?

12        MR. PATTON:  Yes.

13        THE COURT:  This is one example where I'm dense, I

14  didn't get it the first time, maybe more than one, would you

15  run that by me one more time, Mr. Patton, before we get into

16  this?

17        MR. PATTON:  Your Honor, my intention is to show you

18  the volume of data that is still on the hard drives from a

19  computer at the House of Television after that computer has

20  been returned by a renter, has been reformatted and restored

21  and offered up for rental.  To give you an idea of how much

22  data is on there, to then support our argument that if you

23  searched one of these hard drives for particular images, didn't

24  find them, in fact, did not find any child pornography, that it

25  is not reasonable to conclude that you have the wrong computer.


127


1  And, also, to quite frankly cast doubt on Detective Lynn's

2  testimony that she looked or looked very hard for evidence

3  forensically linking the computer to the evidence.

4        THE COURT:  All right, go ahead.  Sir, spell your

5  name for my court reporter?

6        THE WITNESS:  Last name Ganley, G-a-n-l-e-y.  First

7  name is Mark, M-a-r-k.

8            MARK GANLEY, DEFENSE WITNESS, SWORN

9              DIRECT EXAMINATION

10  BY MR. PATTON:

11  Q.   Mr. Ganley, where do you work?

12  A.   I work for the Federal Public Defender's office in

13  Pittsburgh, Pennsylvania.

14  Q.   What do you do for the Federal Defender's?

15  A.    My title is network, I'm computer network administrator.

16  And my job is to purchase the computers, maintain them, install

17  software, design databases for people who need them.  And also

18  in my work I'm called upon to do forensic examinations on

19  occasion.

20  Q.    With the proliferation of child pornography cases and

21  computer based child pornography cases, have you received some

22  training from the office for doing the forensic examination of

23  hard drives?

24  A.    Yes, I have.  I undertook a class from the Internet

25  crimes group that the agent mentioned, in 2001.  There was 24

128

1  hours worth of training.  And I spent three days at a Forensic

2  Tool Kit boot camp for doing forensic examinations on

3  computers.

4  Q.    Have you had other training related to the general

5  operations of computers with regard to the work you do on a

6  day-to-day basis maintaining computers and computer networks?

7  A.    Certainly.  I've attended college courses at Penn State

8  University and the local community college in Allegheny County,

9   and I've got a degree from the Computer Technical Institute

10   from 1987.

11   Q.   Does your daily work require you to work on computers and

12   help users be able to use computers effectively?

13   A.   Yes, that's primarily my job.

14   Q.   Now, to be fair, is it accurate to say forensic

15   examinations of computers is not the main part of your

16   employment?

17   A.   No, it's not.

18   Q.   How many computer drives have you actually forensically

19   examined?

20   A.   I've examined two drives that were child pornography

21   cases, where we actually obtained the drive and could do an

22   exam.  And I've probably done another dozen that were not

23   pornography or child porn related.

24   Q.   With regards to forensic exams of hard drives dealing

25   with child pornography, you said there are only two of them

129

1   you've done where you physically have the hard drive?

2   A.   That's correct.

3  Q.   Have you been involved in going to the FBI office in

4  Pittsburgh to review hard drives there under basically the

5  terms of discovery that had been set by the court?

6  A.   Yes, I have, I visited the FBI.  I've also worked with

7  the Postal Inspectors, and I visited the state police barracks

8  in Indiana and in Butler and in Beaver for various cases.

9  Q.   And during those visits have you engaged in different

10  aspects of forensically examining computers?

11  A.   Yes.

12  Q.   Are you able to run Forensic Tool Kit?

13  A.   Yes, I am.

14  Q.   Do we own Forensic Tool Kit?

15  A.   Yes, we do.

16  Q.   In September of last year did I ask you to use Forensic

17  Tool Kit to evaluate the hard drive of a computer rented from

18  the House of Television?

19  A.   Yes.

20  Q.   Could you explain to the judge what you did to examine

21  that hard drive?

22  A.   Certainly.  I drove to Erie to pick up the drive.  I took

23  the drive out of the rented computer, brought it back to

24  Pittsburgh.  I acquired the drive using forensic software and

25   put it on a forensic computer and did the examination, just as

130

1   the agent would have done.

2   Q.   When you say you acquired the drive, is it accurate to

3   say you want to keep the drive that's in question in tact, not

4   change anything on it?

5   A.   That's correct.  So you have to use a special process

6   where you write protect the drive so that nothing changes in

7   the process of creating the image.  Then you always work from

8   the image so you never touch the original drive.

9   Q.   When you acquire it, then you create what is sometimes

10  referred to as a mirror image of the questioned drive, that's

11  the drive that you actually run the Forensic Tool kit on and do

12  your searching on?

13  A.   That's correct.

14  Q.   After you acquired this particular drive, what did you

15  do?

16  A.   Well, the first thing I did, there are some options that

17  you can set when you acquire the drive, in terms of finding

18  carved data.  I wanted to first acquire the drive and see what

19  was on the partition that came from the House of Television.

20  And after I did that, I verified that none of the files had

21  changed from the time we had picked up the drive until when I

22  had done the exam.  After that I used the Forensic Tool Kit

23  data's carving capabilities and I carved for JPEGs, HTML web

24  pages, word documents --

25        THE COURT:  You got to tell me what that means


131


1  again, I heard it, I forgot, tell me what that means?

2        THE WITNESS:  Typically, on a hard drive all of the

3  files are referenced in a table of contents on the drive, it

4  says here's where the file is.  Well, when you delete a file,

5  it removes it from the table of contents.  But the file is

6  still on the drive, it doesn't actually go and remove the file.

7  So when you carve data, what you do is look in this unallocated

8  space that's considered to be empty space, and the data carving

9  looks for patterns that indicate a certain kind of file.  JPEGs

10  will have a certain pattern at the beginning of a file.  Web

11  pages will have a certain pattern.  And it carves the data,

12  basically, from the empty space.  Okay.

13          THE COURT:  Thank you.

14          THE WITNESS:  Sure.

15   BY MR. PATTON:

16   Q.    After you carved the data -- let me ask you, were you

17   able to actually carve any data from the unallocated space on

18   this drive?

19   A.    Yes, actually I was able to carve 130,000 files.

20   Q.    So these are files that are in the unallocated space on

21   the hard drive?

22   A.    That's correct.

23   Q.    But the data in those files is still recoverable using

24   the data carvings?

25   A.    Using Forensic Tool Kit certainly.


                                132


1    Q.    Can you give a breakdown of those different files?

2    A.    Yes, certainly I can.  Of the files that I found that

3    were unallocated from previous users, there were four AOL buddy

4    lists.  There were 16,138 byte MAP files, which are a type of

5    image.  There were 20 EMF files, which are kind of a windows

6    file that we were able to find.  There were 32,773 JIF files,

7    which are another kind of Internet image.  There were 18,904

8    web pages, HTML files.  62,621 JPEGs, which we've discussed

9    before.  And 176 Adobe Acrobat files.

10   Q.    Now, does Forensic Tool Kit allow you to -- let's focus

11   on the JPEG files, does it allow you to view the JPEG files

12   that the program has carved out in unallocated space?

13   A.    Yes, it does.

14   Q.    When you're using Forensic Tool Kit, does the program

15   itself keep a record of all the different things you're doing

16   as you're doing it?

17   A.    Yes, actually Forensic Tool Kit, from the moment you

18   start it, keeps a log file beginning with when you begin to

19   acquire it and every so many seconds it goes back and adds to

20   the log file.

21   Q.    Does the log file -- would a review of the log file give

22   you an indication of what the forensic examiner has asked

23   Forensic Tool Kit to do and the results?

24   A.    Yes, it would.

25   Q.    Is that automatically generated by Forensic Tool Kit?

133

1  A.   I believe it's by default turned on, yes, I think you

2  have to turn it off in order to not log.

3  Q.   If you want to, can you print that log out to preserve a

4  step by step?

5  A.   You could print it out or you could save it somewhere,

6  yes.

7  Q.   Now, does Forensic Tool Kit also have built into it

8  processes that allows you or allow the program to write up what

9  I would call reports for your use as a forensic examiner?

10  A.   Yes, it does.  Typically, as the agent mentioned, you

11  flag certain files and say bookmark them and then you say

12  generate a report at the end.  It takes about two minutes.

13  Q.   Could you show the judge what one of those reports would

14  look like?

15  A.   Certainly.  Your Honor, if you'll push the button for the

16  judge.  It generates the report in HTML format; in other words,

17  it generates it as a web page.  So you can browse through the

18  list of files and preview them.

19  Q.   Does the user have to put in the case number, case

20  location, case description, things of that nature?

21  A.   Yes, when you start Forensic Tool Kit, you put that

22   information in.  You say begin a new case and it will ask you

23   what's the name of the case, what's the case number, where do

24   you want to save this file.

25   Q.   Did you create a report that contains some of the JPEG


                                 134


1    files that you found on the hard drive?

2    A.   Yes, I did.

3    Q.   Could you show us that?

4    A.   Certainly.  Okay, this is the report, and this is not all

5    of the JPEGs that were found, these are just the ones I flagged

6    and saved these.

7    Q.   So you put in the report you have to, when you're

8    reviewing the JPEGs that you carved, you have to somehow --

9    A.   Just check a box.

10   Q.   Check a box, and then when you click the button that says

11   create a report --

12   A.   You would check the box and then you would click the

13   button that says bookmark these items and give it a name, and

14   then it is automatically included in the report.

15   Q.   And just, for example, the first item that's on the

16  screen there --

17  A.   Certainly, that's a thumbnail of the actual document if I

18  click on the link next to it.  This takes a few moments, that's

19  the actual file.

20  Q.   This is an icon for Dell computers?

21  A.   That's right.

22  Q.   If you click that, if you scroll that, that has

23  information on where on the hard drive that was found?

24  A.   That's correct.  If you'll notice it mentions that it's

25  drive free space.  So it assigns that name because it found the

135

1  file, it doesn't know the file's name or the date or time it

2  was accessed.

3  Q.   Mr. Ganley, in addition to just looking for JPEGs and

4  HTML files, did you take steps to try and see if you could

5  identify prior users of the computer?

6  A.   Yes, I did.

7  Q.   Is that something you can just ask Forensic Tool Kit to

8  do or do you have to try and come up with some strategies to

9  try and come up with that information?

10  A.    Well, kind of both.  You can certainly do text searches

11  for particular names.  But you can also look at the files you

12  carved and try to discern what e-mails addresses were used on

13  those pages, what log in or account names are on those images.

14  And then research those account names in order to find who the

15  people are.

16  Q.    Were you able to identify some of the prior users of

17  this?

18  A.    Yes, actually I found three prior users and some

19  additional log-in names for people that I didn't find who they

20  actually were.

21  Q.    How did you do that?

22  A.    Well, I searched through the web pages and I found some

23  Yahoo profiles.  I found some information that -- documents

24  that they left there.  One gentleman actually left a scanned

25  copy of his driver's license on his drive.


136


1  Q.    How far back in time were you able to go?

2  A.    I actually have found some files that are web pages that

3  were dated 17 months prior to us renting the computer.

4  Q.   Were you able to find e-mails or chats?

5  A.   Yes, I was.

6  Q.   How were you able to locate those?

7  A.   Most of those were done, if people use Yahoo mail or AOL

8  mail, typically those are web pages, so they were carved out

9  with the HTML data.

10  Q.   Now, to locate the prior users, did that take some effort

11  on your part to seek out that information?

12  A.   Yes, it did.  I had to browse through the web pages and

13  look for information and then do a little more research to

14  locate the people.

15  Q.   This wasn't something you could determine just from going

16  through and looking at, for example, the JPEGs that got carved

17  out?

18  A.   No, not at all.

19  Q.   For example, if you scroll through the HTML sites that

20  you had carved out, to look for any traces of information

21  there?

22  A.   Yes, I did.

23  Q.   That would take some additional effort on the part of the

24  examiner, is that correct?

25  A.   That's correct.

137

1  Q.    When a computer is restored, when the operating system is

2  restored --

3  A.    Okay.

4  Q.    Does that actually rewrite the operating system, like say

5  if you're running Windows XP, does that physically now write

6  Windows XP again on the hard drive?

7  A.    Are you speaking in particular with these computers?

8  Q.    Yes.

9  A.    With these computers what I found was that there are

10  actually two partitions on the hard drive.  One partition is

11  the image that they use to restore and then the other partition

12  is what the users actually see.  So I think this would come

13  back to the House of Television, they would run the program and

14  it would take the first partition and just dump it on top of

15  the second one, essentially.

16  Q.    A certain amount of the hard drive is going to be taken

17  up with the files accompanying the operating system, is that

18  correct?

19  A.    That's correct.

20  Q.   When you restore the image, are those files going to be

21  written back on pretty much the same place on the hard drive?

22  A.   Yes, they will.  Because you always start on a hard drive

23  on an area called the boot sector, which is where windows,

24  where the hard drive has to look to start windows.  So it will

25  start from there and add that data right back over top, for the

138

1  most part, of where originally it was.

2  Q.   So assume that a person had a computer, used it for

3  accessing the Internet, word processing, whatever, and then you

4  restored this image on it?

5  A.   Okay.

6  Q.   Is restoring the image going to write over the top of

7  these other images that are on the computer, like say pictures

8  or documents or things like that?

9  A.   Generally not, because before the person started working

10  on the computer that image was there.  So when they create a

11  new file, it would had to have been put on another part of the

12  drive.

13  Q.   When images get -- say if you wanted to save a series of

14  images to a hard drive?

15  A.   Okay.

16  Q.   And say that you find the images or take the images with

17  a web cam and put them on your hard drive and save them on your

18  hard drive --

19  A.   All right.

20  Q.   Will those images be necessarily stored sequentially on

21  the hard drive one after the other?

22  A.   No, not necessarily.  Because what happens is the windows

23  looks for, the operating system looks for whatever space is

24  open.  And in fact, a file, one file may actually be located,

25  pieces of it in three different locations on the drive.  It's


139


1  called defragmenting your drive.  You typically want to go back

2  at some point and bring those files together.  But the first

3  time you write that file it may be put in three different

4  locations.

5  Q.   Even if you defragment the drive and bring that one file

6  that's in three locations back into the same location, it's not

7  necessarily going to take the second image and put it right

8  next to the first image on the hard drive?

9  A.   That's correct.

10  Q.   So these images, say even if you have images saved in My

11  Photos folder on windows --

12  A.   Okay.

13  Q.   So when you open the folder, you see thumbnails of all

14  those images -- are those images stored sequentially in the

15  same place on the hard drive?

16  A.   No, there is no rhyme or reason as to why they would.

17  Q.   They can be anywhere on the hard drive?

18  A.   Yes.

19  Q.   So if one of the images was deleted, then overwritten in

20  the unallocated space, it doesn't necessarily mean that the

21  other ones are going to be overwritten?

22  A.   That would be correct.

23  Q.   In your opinion, if I stored 13 different digital images

24  onto my hard drive, and then say it was a rented computer,

25  returned the computer, the operating system gets restored and

140

1  the computer is re-rented, it's used for nine days by the new

2  person --

3  A.   Okay.

4  Q.   In your opinion, is it likely that all of those 13 images

5  that are in unallocated space will be overwritten in a nine-day

6  period?

7  A.   No, I wouldn't expect them to be, no.

8  Q.   If you ran Forensic Tool Kit to look for those photos --

9  A.   Okay.

10  Q.   And you carved all the data, searched for the photos,

11  searched for the images, I guess I should say, and you didn't

12  find them anywhere or even a portion of them and, again, this

13  is assuming that you are using the computer that's been

14  returned and re-rented for nine days, what conclusion would be

15  drawn as to whether or not those images had ever been on the

16  hard drive?

17  A.   Well, my first conclusion would be that the images had

18  never been there.  That those files never existed on that

19  computer.

20  Q.   Forensically examining a computer, if you develop some

21  question as to whether or not you had the right computer, would

22  you take steps to try and resolve those questions in your mind?

23   A.   Certainly I would.  And certainly a phone call to the

24   rental company would be the first thing I would do.  But I

25   would also look at all of the account names that I could find.


141


1   Maybe they didn't match the person I thought it was.  Most

2   people have more than one e-mail address these days.  People

3   change their e-mail addresses.  People's friends, e-mail, the

4   buddy lists that are on the computer, you ought to be able to

5   figure out who those people are by going to AOL and saying who

6   are these people and maybe you can connect them by connecting

7   their friends.

8   Q.   So even if the name, even if you search through the

9   carved data for the first name or the last name of the person

10  you thought had rented the computer and didn't find their first

11  or last name, would that lead you to conclude forensically

12  there is no way you can establish these people had ever had

13  possession of the computer?

14  A.   I mean that certainly wouldn't be enough to establish

15  that I had the wrong computer or that I couldn't connect them,

16  that would not be enough.

17          MR. PATTON:  Those are my questions, your Honor.

18          THE COURT:  Mr. Hadley.

19          MR. HADLEY:  Couple questions, your Honor.

20                    CROSS-EXAMINATION

21  BY MR. HADLEY:

22  Q.    Mr. Ganley, Attorney Michael Hadley.

23  A.    Hi.

24  Q.    You told us about your experience and training in how to

25  conduct a forensic examination.  I just want to ask you to

                              142

1  precisely in conducting a forensic examination of a hard drive,

2  how important is it to be sure you have the right hard drive?

3  A.    I think it would be the most important thing to do would

4  be to make sure you have the right hard drive.  I mean, you

5  waste an awful lot of time, it takes over a day to acquire the

6  drive.  And why would you waste all that time if you didn't

7  have the right one to begin with.

8  Q.    In your professional opinion, would the failure to find

9  the type of images for which you were searching, would that

10  lead you to conclude that you had the wrong hard drive?

11   A.   That would not be the first thing I would conclude, no.

12   Q.   If in fact you did come to the conclusion that you were

13   sure you had examined the wrong hard drive, in your

14   professional opinion what should a forensic examiner do?

15   A.   Well, I think a forensic examiner would at least go back

16   and verify that with the House of Television and try to locate

17   the actual drive.  And, in addition, I guess my first reaction

18   would be the whole basis of this is that people who collect

19   child pornography save it in other places.  I would be going

20   back with a search warrant for the house of the defendant to

21   see if he kept copies on CD's or a USB drive or a floppy drive.

22   Q.   Mr. Ganley, you were present in the courtroom when

23   Detective Lynn testified, correct?

24   A.   Yes, I was.

25   Q.   You heard her testimony?

143

1   A.   Yes.

2   Q.   And you were here when a Mr. Culhane, the manager of the

3   House of Television testified?

4   A.   Yes, I was.

5   Q.    In your professional opinion, did Detective Lynn have

6   enough information to conclude she had the wrong computer?

7   A.    Well, not knowing because there was no log report, there

8   was no Forensic Tool Kit report, based on her testimony I would

9   say no.

10          MR. HADLEY:  Thank you, no further questions, sir.

11          THE COURT:  Mr. Trabold.

12                  CROSS-EXAMINATION

13   BY MR. TRABOLD:

14   Q.    Sir, how many child pornography investigations have you

15   conducted?

16   A.    How many drives have I examined?

17   Q.    No, how many child pornography investigations have you

18   conducted?

19   A.    Well, I guess I'm not sure I understand --

20   Q.    My point is you're not a law enforcement officer,

21   correct?

22   A.    No, I'm not.

23   Q.    You're the Public Defender's IT person?

24   A.    That's correct.

25   Q.    Okay.  So you're not really qualified to comment on what

1   steps a law enforcement officer should take with regard to a

2   law enforcement investigation?

3   A.    No, I would agree with you that that's the case.

4   Q.    You would agree with me, like the last witness agreed

5   with me, that different hard drives may have different

6   qualities, in the sense that one hard drive may have some

7   defects that another hard drive may not have?

8   A.    Actually, I would disagree with that, and I'll tell you

9   why.  Hard drives are manufactured in sterile conditions

10  because these things actually have billions and billions of

11  bytes of data they have to move at speeds of 7,200 rpm's.  The

12  quality control on hard drives is so strenuous, that I don't

13  agree with him.

14  Q.    Are you saying, then, as you maintain the computers for

15  the Public Defender's office that you have never encountered a

16  computer that, for whatever reason, you just have to get rid of

17  because it doesn't work very well or might have problems?

18  A.    No.

19  Q.    You've never encountered that situation?

20  A.    No.

21  Q.    Every computer you dealt with in the course of your

22  computer career has functioned in a way it was supposed to

23  function?

24  A.    First of all, computers are component based, which means

25  when the hard drive fails, you get a new one.  If the network

145

1  part of it fails, you get a new one.  I never had a computer

2  that just was flaky and I had to throw it away.

3  Q.    Well, my point is you have encountered hard drives that

4  don't perform in a way they're supposed to perform and you had

5  to get a new one?

6  A.    Over time, yes.  Certainly everything breaks.  But if

7  you're saying hard drives are kind of flaky or weird or they're

8  not the same, all hard drives are essentially operated at very

9  strict tolerances, otherwise they don't get sold.  You got a

10  hard drive that is spinning around that fast and you have to

11  find your file, there are six platters, it's spinning around

12  7,200 rpm's and your hard drive has to find it in a matter of

13  seconds.

14  Q.    You didn't do anything to the Eberle's actual computer in

15  this case, correct?

16  A.    That's correct.

17  Q.    So you have no information to share with the court as to

18  what actually went on with the hard drive, that was the hard

19  drive we're talking about here today?

20  A.    That's correct.

21  Q.    And you were here when the detective testified that she

22  found information on the hard drive similar to the information

23  that you testified you found on the hard drive you dealt with,

24  correct?

25  A.    That's correct.  But she also didn't say what information


146


1  she found of any users.

2  Q.    Well, she said she found -- information from users

3  unrelated to that -- that she took to be unrelated to the

4  Eberles, correct?

5  A.    No, she said she found no evidence that tied the computer

6  to the Eberles.

7  Q.    But she also testified that she found other information

8  that she took to be for other users?

9  A.   Well, she said that she found files, she didn't just say

10  who they were tied to.

11  Q.   But she said that she didn't think they were from the

12  Eberles?

13  A.   She said she couldn't tie them to the Eberles.

14  Q.   Which would be information similar to what you found for

15  computer users on your computer that you're testifying here

16  today about?

17  A.   Well, except I have been able to tie some files to some

18  users.  I guess my point is what she didn't say is I found

19  evidence of some other user who owned this, so I thought that

20  this computer belonged to somebody else.  She just said I

21  couldn't tie it to the Eberles.

22  Q.   But she did say that she found information on the

23  computer?

24  A.   But she couldn't say that the Eberles didn't put it

25  there.


147


1  Q.   Okay.  And that has something to do with -- what does

2  have to do with anything?

3  A.   Well, I guess my point is I think if you take the time to

4  look at all of the files that are on the drives, you're going

5  to find some evidence somewhere of somebody who actually used

6  this computer.  You're going to find either log-in screens,

7  you're going to find e-mail messages, you're going to find

8  chats.  I found three previous users on this hard drive.

9  Q.   Yeah, on that hard drive?

10  A.   Yeah.

11  Q.   You didn't look at the Eberle's hard drive?

12  A.   No, but I found three previous users.  That means one

13  person owned it, returned it to rent a center.  Somebody else

14  rented it, returned it to rent a center.  One person is from

15  Corry, PA.  One's from Union City.  They weren't in the same

16  house.  They didn't overwrite each other's data.

17       MR. TRABOLD:  Nothing further your Honor.

18       THE COURT:  Anything else?

19       MR. PATTON:  Yes, your Honor.

20                REDIRECT EXAMINATION

21  BY MR. PATTON:

22  Q.   If Detective Lynn had printed out the Forensic Tool Kit

23  log of her examination of the computer she received from the

24  House of Television, would you be able to review that and then

25  be able to have some knowledge about what in fact was done to

148

1  that drive?

2  A.    Yes, actually if the Forensic Tool Kit log was printed

3  out, you could follow step by step what the examiner did and

4  what time.

5  Q.    And you can't look at the hard drive from the Eberle's

6  computer they got from the House of Television because we

7  physically don't have it, correct?

8  A.    That's correct.

9  Q.    But if Ms. Lynn had printed out the Forensic Tool Kit log

10  of her examination of that computer, everybody would be able to

11  tell exactly what she did, correct?

12  A.    That's correct.

13        MR. PATTON:  Those are my questions.

14        THE COURT:  Thank you, sir, you're excused.  Your

15  Honor, I'd call Ian Chisholm.

16        MR. TRABOLD:  Your Honor, may I have an offer of

17  proof?

18         MR. PATTON:  Mr. Chisholm is a forensic computer

19   expert, he is actually the forensic computer expert that we've

20   hired.  He has reviewed the hard drive of the computer that

21   forms the basis of Counts Three and Four.  He also reviewed the

22   hard drive from the House of Television.  He's also going to

23   have some testimony regarding reasonable conclusions that can

24   be drawn based on findings made during the forensic computer

25   examination.  And I'll put it to you this way.  Before today we


149


1   had no idea what Detective Lynn was going to say she did or

2   didn't do to this computer that she searched in September of

3   '04.  She didn't have any reports from it.  I had no idea what

4   she was going to say.

5         THE COURT:  Let me ask the question this way.  Tell

6   me again, by way of restating your offer of proof, what Mr.

7   Chisholm will say that is germane to the issue of the

8   sufficiency of the probable cause?

9         MR. PATTON:  Well, he is going to give testimony

10   about what steps you could look at to try and forensically link

11   a computer to a particular user.  What steps, if a forensic

12  examiner has doubts about whether they're looking at the right

13  computer, what steps would then be taken.  And what reasonable

14  inferences or conclusions could be drawn from a forensic

15  examination of computers.

16        THE COURT:  All right.  Sir, spell your name for my

17  court reporter?

18        THE WITNESS:  Last name Chisholm, C-h-i-s-h-o-l-m,

19  first name Ian.

20           IAN CHISHOLM, DEFENSE WITNESS, SWORN

21              DIRECT EXAMINATION

22  BY MR. PATTON:

23  Q.   Mr. Chisholm, how are you employed?

24  A.   I'm self-employed, sir.

25  Q.   As what?


                         150


1  A.   As a computer forensic expert.

2        MR. TRABOLD:  I'm sorry, I didn't hear that, I

3  apologize.

4        THE COURT:  Mr. Chisholm, speak into the microphone.

5        THE WITNESS:  I'm self-employed, computer forensics

6  and data recovery.  And also Internet investigations.

7       THE COURT:  Is that an Australian accent?

8       THE WITNESS:  It's British, sir.

9  BY MR. PATTON:

10  Q.   Could you give the judge a general idea of the type of

11  work you do in your business?

12  A.   It's recovering data off of hard drives or forensically

13  examining hard drives for data or evidence.

14  Q.   Is the data recovery more along the lines of somebody

15  calling up and saying oh my God, my computer crashed, help?

16  A.   They normally say more than that, but yes.

17  Q.   The forensic evaluation of computers, what experience do

18  you have doing that?

19  A.   Eight years experience.  Most of the cases that come to

20  court are job related.

21  Q.   How many different hard drives, roughly, have you

22  forensically examined in child pornography cases?

23  A.   In child pornography, in the hundreds, over a hundred.

24  Q.   And have you testified in court before as an expert?

25  A.   Yes, I have.

151

1  Q.   In what courts have you testified?

2  A.   Pittsburgh federal court, it was U.S. versus -- I can't

3  pronounce the name -- it's an Indian name, I can't pronounce

4  it.  But there are other cases that I have done.  But it hasn't

5  gone to trial.

6  Q.   Did my office FedEx you a hard drive from the House of

7  Television?

8  A.   Yes, sir.

9  Q.   And did you do a forensic examination of that hard drive?

10  A.   I did, sir, yes.

11  Q.   Were you able to recover data from the unallocated space

12  of that hard drive?

13  A.   Yes, I did, sir.  And the hard drive that you provided to

14  me had been provided to you and not used after you received it.

15  Q.   Can you give us an idea of the amount of data that you

16  were able to recover in the unallocated part of the hard drive?

17  A.   The recovered files, deleted files that were on the hard

18  drive prior to the re-installation of the operating system

19  amounted to hundreds of thousands.

20  Q.   Were you able to develop at least some information to try

21  to identify prior users?

file:///A|/EBERLESP.TXT

22  A.   Oh, yes, many user names and instant messenger chat logs.

23  Q.   Could you just give an explanation of the steps you take

24  when you are trying to identify previous users from information

25  taken from or found in unallocated space?

152

1  A.   Well, normally I have an idea of a person that I need to

2  identify.  In this instance I had no clue whatsoever.  So I

3  carved out HTML web pages, and I searched for such terms as an

4  e-mail address.  Such as ask Yahoo dot com.  And then I would

5  examine that to ascertain if it was a user name -- and then I

6  would do a search using the user name on the hard drive.  And

7  that would locate some users.  Other users, like e-mail

8  addresses, within files which may be e-mail files that were

9  recovered, you would have data in their e-mails sent and

10  received.  Telephone numbers, credit card information.

11  Q.   If you were trying to identify a prior user, would you

12  try and search just using the person's first name as a search

13  term?

14  A.   No, unless it was a very, very rare first name.  The name

15  George, as an example, or Fred or Smith, you'll get hits in

16  dictionaries, you could get hundreds of thousands of hits.  So

17  you have to isolate your search terms.

18      THE COURT:  Mr. Patton, we're going to take a short

19  recess.

20      (Recess from 1:58 p.m.; until 2:10 p.m.)

21      THE COURT:  Mr. Patton, before we continue, let me

22  ask a question here.  To possibly shorten this up somewhat,

23  maybe not, it doesn't really matter.  If for purposes of

24  discussion I were to conclude tentatively that the computer

25  that we're talking about that was looked at by the detective

153

1  was in fact Mr. Eberle's computer, does that shorten his

2  testimony?

3      MR. PATTON:  Yes.

4      THE COURT:  All right.  Well, let's just put it this

5  way.  I just planted the seed in your mind, you can pursue this

6  then as long as you want.  But --

7      MR. PATTON:  If you were going to make a factual

8  finding that the computer Detective Lynn --

9      THE COURT:  Let me put it this way.  I haven't sat

10  down to write the findings of fact yet, but I'll be quite

11  candid.  Absent a significant change of heart or new evidence,

12  in all likelihood that's a finding that will be made.

13        MR. PATTON:  I do have some questions to ask based

14  on, if I could, with Mr. Chisholm on that issue.

15        THE COURT:  Take it for what it's worth and gauge

16  your time accordingly.

17        MR. PATTON:  Yes, your Honor.

18  BY MR. PATTON:

19  Q.   Mr. Chisholm, as a forensic examiner, if you are told you

20  have Mr. X's hard drive and it is established that the hard

21  drive you have is Mr. X's, and you're asked to look for

22  identified images, where you have the hash for those images,

23  you have the file names for those images and you look for the

24  images and despite all your efforts you can't find the images,

25  what conclusion do you draw from those facts?


154


1  A.   A drive that was used for nine days after, I would say

2  they were never there.

3  Q.   The nine days after, in this case you're aware that the

4  computers that the Eberles had used and the one that Detective

5  Lynn was looking at had been re-rented and had been used for

6  nine days?

7  A.   I know that, yes.

8  Q.   So your comment that if it's only been used for nine

9  days, then your conclusion would be that those images had never

10  been on the hard drive?

11  A.   That's correct, sir.

12  Q.   Assume that even though you're told you have Mr. Eberle's

13  computer, but despite your best forensic evidence, you cannot

14  find anything forensically where you can say okay, I have

15  George Eberle logging on to e-mail or I have him chatting, but

16  you are told look, this is George Eberle's computer, can you,

17  based on your forensic evaluation, say no, I don't have George

18  Eberle's computer?

19  A.   No, I can't.

20  Q.   As a forensic computer examiner, before you sit down, are

21  you able to know how a particular person has used their

22  computer?

23  A.   Before getting the hard drive?

24  Q.   Right.

25   A.   No.


155


1   Q.   And is it possible that somebody rented a computer and

2   either didn't use it or just used it very, very rarely or

3   virtually not at all?

4   A.   That's possible.

5   Q.   But if you were told I got Eberle's computer and even

6   assume you looked hard for evidence to try and link it to the

7   Eberles but you couldn't do it, but you knew these images you

8   were looking for, hash file names --

9   A.   Sizes, dates.

10   Q.   Everything, and you didn't find those images, your

11   conclusion would be the images were never on the hard drive?

12   A.   That's correct, because there's other references upon the

13   hard drive to where the files were.  You have file names and

14   link files and log files.  So certainly if I found nothing, I

15   would determine nothing was there.

16   Q.   In the other cases where you've examined hard drives in

17   child pornography cases, the ones where you actually found

18   child pornography, did you find just one or two images of child

19  pornography?

20  A.   More like hundreds.  All filed in folders of specific

21  names related to the type of image.

22       MR. PATTON:  Those are my questions, your Honor.

23       THE COURT:  All right.  Mr. Hadley.

24       MR. HADLEY:  Based on what we heard earlier, I don't

25  have any questions.


156


1        THE COURT:  All right.  Yes, sir.

2        MR. TRABOLD:  Just briefly, your Honor.

3                  CROSS-EXAMINATION

4   BY MR. TRABOLD:

5   Q.   Sir, how many times have you testified for the

6   prosecution or the government?

7   A.   About three in federal court.

8   Q.   Federal court did you say?

9   A.   Yes.

10  Q.   And that would down in Pittsburgh?

11  A.   In Pittsburgh, yes.

12  Q.   So when you testified in federal court in Pittsburgh, did

13  you testify, those three times, just so I'm clear, were those

14  for the Federal Defender's office or for the United States?

15  A.   Defender's office.  Or separate lawyers, but not for the

16  government.

17  Q.   Have you ever been retained by the government to testify

18  as a prosecution witness?

19  A.   In the UK I had, but certainly not forensic wise.

20  Q.   Just so I'm clear, is it accurate to say that you have a

21  lengthy background in -- I'm probably not phrasing this

22  correct, but sort of like a Secret Service, the United

23  Kingdom's Secret Service version, would that be accurate?

24  A.   I did work for the government, sir, yes.

25  Q.   So much so that you provided protection to members of


157


1  British royal family, things like that?

2  A.   Yes, sir.

3  Q.   Subsequent to that you come over to the United States

4  and --

5  A.   I worked shortly for the foreign commonwealth at various

6  embassies and then came here.

7   Q.   Incidentally, in this case here, what's your expert

8   witness fee?

9   A.   My fee?

10   Q.   Yes, sir.

11   A.   I believe it's $250 per hour.

12   Q.   How many hours have you billed the government for?

13   A.   On this particular case?

14   Q.   Yes.

15   A.   I can't recall, to be honest.  It's significant.

16   Q.   And just so the record is clear, you have forensically

17   examined the second Eberle computer, but not the first one?

18   A.   Are you talking Detective Lynn's one?

19   Q.   Let me see if I can rephrase that so you understand what

20   I'm talking about.  The one that forms the basis of the charges

21   we're here on today where there were actual images of child

22   pornography found, you went to the FBI and actually examined

23   that computer?

24   A.   That's correct, sir.

25   Q.   But the first one where there's a claim nothing was found

158

1    on, you didn't have an opportunity to look at that?

2    A.    Not at all, sir.

3    Q.    The House of Television computer?

4    A.    I have not seen that one.

5    Q.    And you don't have a basis to dispute the detective's

6    factual account that when she looked at that first computer,

7    the House of Television computer, for lack of a better word,

8    that she didn't find any evidence of child pornography, nor did

9    she find any evidence that the computer or any documentation

10   linking that computer to the Eberles?

11   A.    Oh, no, I can't dispute anything that she said.

12          MR. TRABOLD:  Nothing further, your Honor.

13                      REDIRECT EXAMINATION

14   BY MR. PATTON:

15   Q.    If Detective Lynn had printed out the log sheet that the

16   Forensic Tool Kit would have created while she was examining

17   the computer back in September of 2004, could you have then

18   reviewed that to give an opinion as to the thoroughness and the

19   quality of the work she did then?

20   A.    I could make a determination of that, yes.

21   Q.    But you can't dispute Detective Lynn because you don't

22   have any --

23   A.   I don't have nothing to refer back to, no.

24         MR. PATTON:  Those are my questions, your Honor.

25         THE COURT:  All right, sir, thank you very much.


                              159


1          THE WITNESS:  Thank you, sir.

2          MR. PATTON:  That's the evidence I have to present

3   on behalf of Mr. Eberle, your Honor.

4          THE COURT:  All right.

5          MR. HADLEY:  We join in the evidence for Alesha

6   Eberle, we nothing in addition, your Honor.

7          THE COURT:  All right.  Couple of housekeeping

8   matters here.  Was there some question about these Internet

9   chats and how many I'm supposed to get?

10         MR. HADLEY:  If it please the court, Attorney

11  Trabold and I have spoken, since he has the copy machine here,

12  agreed if the court hears argument, he'll get them to you

13  within a day or so, photocopies.

14         THE COURT:  All right.  That's the testimony, those

15  are the exhibits, then, it would be helpful for me, once I get

16  this transcript and start reflecting on it, that I have an

17  opportunity to read what you have to say by way of brief

18  summary.  Do you have something that you want to say, Mr.

19  Patton?

20      MR. PATTON:  Your Honor, the entire basis of finding

21  probable cause to search the computer in the Eberle's home in

22  March of 2005, is the claim that back in September, at the

23  latest, September 2, 2001, George Eberle put these images up to

24  Yahoo and, therefore, they were on his hard drive.  And because

25  he's a child pornographer, he'll never destroy these images

160

1  willingly.  But it also puts in there that even if he does

2  delete them, we can find them through forensic software

3  programs.  And that even if he gets new computers, these images

4  are going to be on the hard drive of every computer he uses

5  because before he gets rid of the old computer, he'll save it,

6  and then when he gets the new one, he'll actually put it on the

7  hard drive of the new one.  But, your Honor, if you then get

8  one of George's computers, run the forensic software on it, and

9  you don't find the pictures, that claim goes out the window.

10  And you heard Mr. Ganley and Mr. Chisholm say yeah, the thing

11    had been reformatted and was re-rented out, it had been out for

12    nine days.  And that these images aren't going to all get

13    overwritten, if any of them, in nine days.  The government

14    papers say that it had been re-rented for approximately a

15    month, I don't know where that came from.  But the evidence you

16    had presented to you today was it had been out for nine days.

17    And I don't think there's any way any reasonable law

18    enforcement officer wouldn't want -- wouldn't realize when

19    writing up the affidavit in support of a search warrant for

20    March, 2005, that it wouldn't be absolutely crucial to tell the

21    magistrate, by the way, we got one of George Eberle's computers

22    and looked for these images and they weren't on there.

23          THE COURT:  In terms of Franks, this is a sin of

          _____

24    omission?

25          MR. PATTON:  A material omission.


161


1          THE COURT:  Is that what your point is -- let me ask

2    you this.  Assuming that the detective had included the

3    information that a search of the computer failed to reveal any

4   images of child pornography.  Assume that was included in the

5   affidavit.  Also included in the affidavit, though, was it not,

6   was information concerning the interview by the victim.  And

7   this is the crux of this case, I think.  This is in my view how

8   this thing turns.  My question to you is why in your view, even

9   with the inclusion of the allegedly material information, why

10  in your view doesn't the detailed discussion with the alleged

11  victim independently support probable cause?

12         MR. PATTON:  Because --

13         THE COURT:  To me that is the issue in the case.

14         MR. PATTON:  Because the only way her testimony

15  relates to searching George Eberle's computer in March of 2005

16  is by Lynn taking that information and saying okay, these

17  images were on the hard drive of the computer.  But they're

18  saying this happened back in 2001, and we're in 2005.  Well,

19  let me take that back, actually in the affidavit I believe they

20  say 2002.  Even though at that point Detective Lynn has the

21  information from Yahoo saying that these images got put onto

22  the Internet --

23         THE COURT:  Apparently was an error.

24         MR. PATTON:  It's an error, but it's an important

25  error because it makes a year difference and she got the

162

1   information from Yahoo that says they got put up there on

2   September 2, 2001.

3        THE COURT:  Back to the original question.

4        MR. PATTON:  The idea that there is probable cause

5   to search the hard drive of the computer is these images were

6   on the hard drive, were on the computer because George and

7   Alesha showed the images to the victim on the computer screen.

8   And once they're on the hard drive, they're going to stay on,

9   even though this was three-and-a-half years ago and even if

10  he's gotten a new computer, don't worry about it because he's

11  not going to get rid of it because it's child porn, and even if

12  he got new computers, he's going to save it before he gets rid

13  of the old one and put it on the new one.  That's the only

14  evidence supporting the search of the hard drive.  I think it's

15  important for you to distinguish between getting a search

16  warrant to search the residence of the house or CD's or drives

17  or something like that, or maybe they printed them out and so

18  they're in paper form.  I don't object to any of the search of

19  anything else in the house other than the hard drive.  But to

20    get probable cause to search the hard drive of the computer, it

21    is once George has it on the hard drive of the one computer,

22    it's going to be on the hard drive of every computer he then

23    gets because he's going to take it off the old one and put it

24    on the new one.  He gets rid of that one, saves it, puts it on

25    the new one.


163


1        THE COURT:  Sequentially you mean?

2        MR. PATTON:  Yes.  Apparently to infinity.  If that

3    is true, those images would have been on the hard drive of the

4    House of Television computer.  Detective Lynn knew or should

5    have known that those images were not on the House of

6    Television computer, therefore, it would not be reasonable to

7    believe that they were on the hard drive of the computer he got

8    in March of 2005.

9        THE COURT:  Should the detective then have

10    concluded -- tell me if this is where this logically goes.  Is

11    the end game of this the detective, based upon her failure to

12    have found pornography, should have concluded, after her

13    interview with this victim, that the victim was not telling the

14  truth?

15        MR. PATTON:  No, she can believe the victim.  But,

16  judge, the victim's talking about something that happened,

17  depending on what date you use, two-and-a-half or

18  three-and-a-half years ago.  Now, the government wants to get

19  over that staleness problem by using this daisy chain argument

20  that every computer George is going to get is going to have

21  this on the hard drive.  That's the only way they get over the

22  staleness problem.  And importantly, also, with the search of

23  the computer from House of Television, not only are the Yahoo

24  images not found, there is absolutely no child pornography

25  whatsoever on George Eberle's computer.  This is a computer


164


1  that he's had for eight months.  So there is no good-faith

2  basis to then say George Eberle is a child pornographer who

3  stores his child porn on his computer hard drive.  I mean, even

4  if you believe the victim that if you took these web pictures

5  of me two-and-a-half or three-and-a-half years ago, that

6  doesn't give you probable cause to search his computer in March

7  of 2005.  Unless you buy the argument of, well, you're going to

8  keep it forever and move if from computer to computer to

9  computer.  But if you know that that argument is not true, then

10  the probable cause for searching the computer is gone.  And you

11  do not have to conclude that the victim is not telling the

12  truth.

13        THE COURT:  Tell me about the severance question?

14        MR. PATTON:  Judge, the severance issue in this case

15  is really important because this is wonderfully ironic after

16  Detective Lynn's testimony that child pornographers never get

17  rid of their child porn and they always keep it.  The only

18  child pornography found on the computer taken in March of 2005

19  was all deleted.  And except for three images, all of it was in

20  unallocated space.  And it's in unallocated space, so the

21  government, at least as far as I'm aware, the government has no

22  evidence to be able to say who was using the computer at the

23  time that these images were written on the hard drive.  And

24  it's going to come down to either somebody else was using it or

25  George -- the defense it's not me, it's either someone else or


165


1  my wife or someone else.  Her defense is going to be it's him.

2          THE COURT: It's all that it could be, other than --

3          MR. PATTON: It could be a third person. They're

4    just absolutely mutually antagonistic. You now have these

5    images, these chat things coming in that are all based on

6    Alesha, not on George. And so I would submit that to avoid

7    unfair prejudice to George, that the trials should be severed.

8          THE COURT: All right, thank you.

9          MR. PATTON: Judge, I just want to distinguish the

10   one case the government cites in support of its argument, it

11   had to do with a drug sniffing dog and saying that, well, the

12   dog had sniffed on a suitcase and had not alerted and didn't

13   include that fact in their search warrant application --

14         THE COURT: Back on the suppression issue?

15         MR. PATTON: Yes. The Third Circuit said, well, it

16   was okay he didn't say it because if you want to put the fact

17   in that they didn't alert, you would also put in the fact,

18   well, you know, people can mask the smell of the drugs. Well,

19   in this case part of what Detective Lynn is trying to convince

20   the court, after this long period of time, with the forensic

21   software stuff we can find the deleted stuff. And when she

22   went and got the computer at the House of Television, she knew

23  it had been re-rented, she knew it had been reformatted, but

24  she still was like, hey, I can use my forensic software stuff

25  to find what's been now deleted.  And in fact did find a lot of


166


1  stuff.  So this case that the government cites has nothing to

2  do with this, because Detective Lynn can't say, well, if it's

3  been deleted, I can't find it.  The whole point of getting the

4  House of Television warrant was even though it's been deleted,

5  I can get it.  So that case just has no relevance.

6        THE COURT:  Thank, you Mr. Patton.  All right, Mr.

7  Hadley.

8        MR. HADLEY:  If it please the court, on the search

9  warrant, just briefly, I believe Mr. Patton went through it

10  thoroughly.  But to my mind, I think the easiest way to vision

11  this thing is if Tiffany had said to the police in 2005, if she

12  had not said I was sexually assaulted and pictures were taken,

13  but instead had said in either 2001 or 2002, I had seen George

14  and Alesha smoke marijuana, I think we'd all agree that in '05

15  there's not probable cause to go back and get a search warrant

16  based on what she may have seen in '01 or '02.  So the

17   government attempts to breach the staleness in the absence of

18   probable cause because of the staleness by saying this is some

19   kind of unique crime, this is different than anything else.

20   Which three-and-a-half years later no reasonable person would

21   suspect evidence to be in a place where the government armed

22   with a warrant would go in three-and-a-half years later.  They

23   try and get over that by laying out the uniqueness of this

24   crime in their opinion except the evidence that Detective Lynn

25   had is this connection or daisy chain, as Mr. Patton called it,


167


1   doesn't exist.  The trail runs dry in September of '04, and

2   they're done, it's got to end right there.  Especially when

3   you're trying to overcome staleness to begin with.  So you

4   create a special category.  But that special category of sex

5   offenses falls apart.  So it needs to be in there.  And no

6   magistrate, no one would form probable cause if the omitted

7   material had been there because you would have concluded that

8   the trails run dry, he's not keeping it, they're not keeping

9   it, it's stale, we're not going to execute a search warrant.

10          Judge, on the severance issue.  You know, obviously,

11  the defendants are going to be pointing fingers at each other.

12  We're going to say it's George, they're going to say it's her

13  or a third party.  There's some --

14       THE COURT:  You don't have to commit to this and I'm

15  not even sure -- well, it could be germane.  But have you made

16  a decision at this point in time as to whether your client is

17  going to testify?

18       MR. HADLEY:  I haven't made that decision, that's

19  one of those game-day decisions, your Honor, you just play it

20  by ear.  I can't tell you one way or the other.  Obviously,

21  with Counts One and Two out, it does make it a little

22  different.  But you're going to have them pointing the finger

23  at each other.

24       THE COURT:  On the severance issue, though, as laid

25  out in Mr. Patton's brief, he's feeling that his client's, that


168


1  the ox of his client is being gored more than yours because of

2  your client's Internet chats, isn't that right?

3       MR. HADLEY:  If you let those in and I'll argue that

4  in a moment, if I may, yeah, I think that's his position.  And

5    I'm indifferent, you want to sever them and need to sever them,

6    we're not objecting to that.  I just noticed today --

7          THE COURT:  Are you joining -- that's a sloppy way

8    of asking the question, do you want a severance, too?

9          MR. HADLEY:  Yes, we do.  I'll tell you one other

10   thing, if I may.  Just learning it today, when you got two

11   attorneys there, one guy goes and asks all the questions of

12   Detective Lynn, there's not a whole lot left for me to do for

13   my client.  Just as a practical matter, it kind of looks like

14   your client is not getting represented as well.  Whoever gets

15   to go first --

16         THE COURT:  Mr. Patton is a hard act to follow.

17         MR. HADLEY:  Exactly.  That's part of it.

18         THE COURT:  We could reverse it.  Let's talk about

19   your motion in limine?

20         MR. HADLEY:  Judge, as we agreed, you'll get the

21   full chats to review.  There is no admission of wrongdoing, of

22   criminal activity at all in any of these things.  This is just

23   a stigma of certain admissions, certain discussions, and

24   talking about pornography, totally legal.  It's all adults.

25   The best example I can think of to help the court grasp this

1  one is --

2       THE COURT:  Everybody tries to help me grasp things.

3       MR. HADLEY:  Just imagine, Judge McLaughlin, if you

4  were falsely charged with bank robbery, a federal crime, a bank

5  robbery.  And the government, to prove their case, wanted to

6  introduce evidence that, well, Judge McLaughlin, you know, he

7  has a bank account.  He goes in the bank and transacts

8  business.  We want to introduce that as some kind of proof that

9  he robbed the bank.  Now, that would be I think inadmissible in

10  any court, just as this would.  They're trying to prove that my

11  client illegally possessed child pornography and to prove this,

12  they're going to say she had legal adult conversations with

13  another person.  It doesn't add up, it doesn't fit, and there

14  is a lot of stigma.  It wasn't hard to go back and find, we all

15  know, I don't think there's any dispute, homosexuality, she

16  admits to, bisexuality, creates great stigma.  And when you get

17  a chance to look at these, they don't lend anything to the

18  evidence and they should be kept out.  Thank you, your Honor.

19       THE COURT:  Okay, Mr. Trabold.

20       MR. TRABOLD:  Your Honor, if I could just take these

21  in reverse order.  With regard to the chats first.  These are

22  chats where this defendant, Alesha Eberle, talks about viewing

23  pornography on the Internet, indicates that she's bisexual, and

24  indicates that she's in teen chat rooms talking to teenagers.

25  They're clearly relevant in this case.  And the legality of the

170

1  conversations has nothing to do with it.

2      THE COURT:  This is 404(b) stuff under the

3  exception?

4      MR. TRABOLD:  It is not 404(b), the government is

5  contending it is not 404(b) because -- the chats are statements

6  that are intrinsic to the crimes themselves.  They are chats

7  which occur, at the very most, a month or two time difference

8  from when the child pornography that's at issue in this case,

9  is actually put on the computer.  Our point is simply this.

10  The chats show a variety of things.  Number one, they show that

11  this defendant is interested in pornography.  Which is

12  something I need to demonstrate to the jury because, obviously,

13  if she's not interested in pornography, she's not going to be

14  interested in child pornography.  Number two, and equally as

15  important, it shows that she's on the computer, that she's

16  using the computer, that she's skilled at using the computer

17  around the time when these child pornography images are out put

18  on the computers.

19        Finally, there's a chat in there where she talks

20  about being in a chat room, talking to minors in the chat room,

21  and it's an underage teen chat, which is clearly relevant to

22  this case because you're talking about underage sexual

23  photographs that were put on their computer.

24        This is not 404(b) evidence because they are

25  statements right from the defendant occurring right around the


171


1  time of the occurrence of these offenses.

2        THE COURT:  You're saying it's relevant evidence,

3  for instance, on the issue of intent?

4        MR. TRABOLD:  Correct.  By her saying in a chat to

5  her brother -- something to the effect that I'm on looking at

6  pornography.  That shows that she has an interest in

7  pornography and, therefore, is the necessary first step that I

8  need to establish with regard to her intent to look at and

9  download, receive, possess child pornography.

10        THE COURT:  What about the severance?

11        MR. TRABOLD:  Judge, the case law is overwhelmingly

12  clear that antagonistic defenses is not a basis to sever.

13  Otherwise, almost every case where there are co-defendants

14  would be severed.  It's black letter law that antagonistic

15  defenses is not a basis to sever.  In fact, I think it's the

16  Zafiro case, cited by the defense, lays out in very stark terms
    ‾‾‾‾‾‾

17  what are the only real three reasons to sever defendants in a

18  case like this.  One is if it's a complex case.  This is not a

19  complex case, it's not even close to being a complex case.

20  Number two is in the Bruton type case, which now that Counts

21  One and Two are not an issue in this case.  Number three is if

22  there's evidence that exculpates one defendant will be

23  unavailable if they testify together.  And that also is not the

24  case.  So none of the three examples contemplated by the

25  Supreme Court and the Third Circuit are relevant to this case.


172


1  And antagonistic defenses are not enough for you to sever.

2  Just because a defendant wants a separate trial so they can

3  point at their wife and says she's the one that did it, does

4  not form the a basis under federal law to severe a case.

5         Finally, with regard to the issue of suppression.

6  The case law instructs you to first go to the issue of good

7  faith under Leon, and resolve that issue first.  Because if you
          ____

8  resolve that issue in favor of the government, there is no

9  reason to go any further.  And it's our position that you can

10  resolve this case under good faith and you can resolve it even

11  without relying on good faith.  But I'll talk about good faith

12  first.

13         First, your Honor, the whole basis for the

14  good-faith exception under Leon is that we want to deter police
                              ____

15  misconduct by excluding evidence that they obtain which would

16  be of value.  That's basically the basis for the exclusionary

17  rule, to protect people's Fourth Amendment rights by excluding

18  evidence in the hopes that police misconduct is deterred.  My

19  question in this case is what is the police misconduct.  There

20  are two search warrants in this case, which in and of itself, I

21  would submit to you, is indicative of the fact that there is no

22  police misconduct in this case.  I submit to you you should not

23   have been left with the impression that this is a cavalier law

24   enforcement officer running roughshod over the rights of

25   criminal defendants.  And if you don't make that conclusion

173

1   that under the good-faith exception, you should not suppress

2   this evidence.  And the good-faith exception lays out in very

3   stark terms the four parameters that I'm talking about.  Two of

4   them obviously don't apply.  There's no indication here that

5   the magistrate, the district justice fully abandoned her role

6   in this case or that the warrant was facially deficient in the

7   sense that it gave permission to search the wrong location.  So

8   those two are out.

9          Additionally, your Honor, I submit to you that

10   there's absolutely no way that you can conclude that the second

11   search warrant was so lacking in probable cause to be facially

12   deficient or that to cause somebody to rely on it would be

13   totally unreasonable.

14          Finally, there is no false information in this case.

15   There are no omissions of material fact which should cause the

16   good-faith exception to not apply in this case.

17          THE COURT:  This is true, though, it's different

18   sides of the same coin.  If he's right on Franks -- let me put
                              _____

19   it this way.  If an omission was recklessly made, you can't

20   have the Leon exception, can you?
        ____

21          MR. TRABOLD:  I think that's accurate.

22          THE COURT:  Let's now focus on what is the real

23   heart of this thing.  What I need to hear from the government

24   is why -- I'm not going to structure the argument, you know

25   what Mr. Patton said, you tell me what you think about it?


174


1          MR. TRABOLD:  Well, I gather that my sense of their

2   argument was that it oftentimes comes down to staleness.  And

3   that this case comes down to staleness and if the chain is

4   broken, the government has no way of overcoming staleness.  I

5   would absolutely disagree with that in this sense.  A matter of

6   days before the second search warrant was executed, the

7   government received information from a 15-year-old victim that

8   these defendants violated her and took pictures of her back in

9   2001.  But most important, as it relates to the staleness

10  issue, the victim in this case said, mere days before the

11  government executed their search warrant, she had a

12  conversation with these defendants where they indicated that

13  they would like to engage in these types of activities with her

14  again, and indicated that in no uncertain terms that they were

15  interested this doing sexual things with her.  This

16  demonstrates that these two defendants at the time the

17  government executed their search warrant, still had a sexual

18  interest in children which overcomes the staleness issue.  And

19  that's information the government receives three or four days

20  before the search warrant is executed.  But most critically

21  here, separate and apart from the staleness issue.  The cases

22  on material omission instruct you that what you need to do is

23  not look at everything in a vacuum and what you essentially

24  need to do is put the omitted information back in the warrant

25  and see if there's still probable cause.  But in this case your

175

1  duty is not to just put the omitted information starkly by

2  itself, of course, the officer would have put in I searched

3  this, she even testified to this, I searched this computer, I

4    did not find any images of child pornography.  However, the

5    computer was reformatted or wiped or whatever terminology she

6    would have used, and it had been re-rented to somebody else.

7    Now, I submit to you that no reasonable magistrate, when

8    presented with those set of facts, would have concluded that

9    there was no probable cause in this case.  Because what you

10   essentially have are two intervening factors that would cause a

11   magistrate to conclude, okay, there is no child pornography on

12   this, however, the computer had been re-rented to somebody else

13   and the rental agency or rental company had done something to

14   the hard drive, formatted it, wiped it, whatever that may be,

15   which would explain to a magistrate why there's nothing on the

16   computer.

17        THE COURT:  So are you saying, then, the defendant's

18   point that if the detective had looked harder, apropos to the

19   experts they put on who allegedly found all kinds of

20   information, if she had looked harder, she would have found

21   additional things is relevant to the analysis?

22        MR. TRABOLD:  The case law does not require the law

23   enforcement officer to engage in a perfect investigation.  In

24   any case, this case, any case that comes before you, judge, the

25   law enforcement officer could always do more or could always do

176

1   things in a different way or could attempt to do things in a

2   perfect way.  I'm not in any way casting aspersions on the

3   investigation that was conducted, but all of that is of no

4   consequence.  What a defense expert thinks the law enforcement

5   officer should have done two years after the fact is of no

6   consequence.  The only issue before you is did this officer act

7   in bad faith.  And assuming that you make that determination

8   that the officer acted in bad faith, if you put the omitted

9   information in, does that destroy probable cause.  And our

10   position is, number one, you had the opportunity to observe the

11   officer.  There can be no conclusion that this officer acted in

12   bad faith.  There's no indication that this officer ran

13   roughshod over the rights of these defendants.  Why would a

14   officer who had that intention, who wanted to lie to a

15   magistrate, why would you engage in these types of tactics

16   where you go get two search warrants to obtain evidence.  That

17   is not conduct indicative of an officer acting in bad faith.

18        THE COURT:  So to put a fine point on it, your point

19  is -- if in fact, assume she said Mr. Eberle's computer -- that

20  Mr. Eberle's computer was searched and it revealed nothing and

21  that it had been wiped or whatever the other term is, do I take

22  it that what you are saying, then, the magistrate could have

23  concluded maybe it was there and it was destroyed, wiped off,

24  that's why it wasn't there?

25          MR. TRABOLD:  My point is that she would have


177


1  without question included those two additional facts, meaning

2  the computer was reformatted or wiped or whatever term you want

3  to use and it had been re-rented for a period of time.

4          THE COURT:  Now, how critical -- and I don't know if

5  I asked Mr. Patton this, but when he gets up for his final

6  time, maybe I will.  How critical -- well, put it this way.

7  The reasonableness of relying on the young victim's, not

8  testimony, statement at the police station and the forensic

9  interview, the reasonableness of accepting what she was saying

10  as true and concluding, for instance, that she was in fact the

11  person who was on the picture, that is an important component

12  in the whole calculus of probable cause here, isn't it?

13          MR. TRABOLD:  Yes.  I did not hear any evidence

14   today which would cause anybody to conclude that it was

15   anything less than perfectly reasonable for this law

16   enforcement officer and her partner to conclude that the victim

17   was telling the truth.  It is absolutely laughable to conclude

18   that a law enforcement officer, when asking a victim if this is

19   a picture of them, if pictures that they have are pictures of

20   the victim, would show the victim a lineup of child pornography

21   pictures and ask her to pick herself out.  That is absolutely

22   total and utter nonsense, it would never occur in a law

23   enforcement setting, especially in a case like this.  You don't

24   show a 15-year-old kid other pictures of child pornography that

25   have nothing to do with them.  This is what happens in this


                                178


1    case.  And the fact that the victim has now said those are not

2    pictures of her is of no consequence.  All that matters is what

3    the officers' knew when they interviewed her in March of 2005.

4    The victim comes in, is interviewed.  Tells a great amount of

5    detail about what it is that happened to her at the hands of

6    these defendants.  She includes in her version of events that

7   pictures were taken of me and a videotape was taken of me.  At

8   the close of the interview, the officers say well, we have

9   these pictures, they ask her, without even showing her the

10   pictures, they ask her some questions to confirm in their own

11   mind whether they're even on the right track.  And by that I

12   mean they ask her questions to confirm that what she says about

13   the pictures are what the pictures actually depict.  If she had

14   said well, these pictures were taken of me out on Presque Isle

15   on the beach, then they would have known this isn't the girl

16   we're looking for.  She describes the general factual scenario

17   that is borne out by the pictures.  There's a bunch of

18   different pictures taken of me, some of them I was naked, some

19   to them I had my underwear on, some of them I had my bra on.

20   She then goes even further than that and says in the pictures I

21   know at the time, not in the pictures, I know at the time I had

22   a locket or a necklace that I wore all the time, I wore a ring

23   on one of my left fingers, I wore a particular bra.  All of

24   that is borne out by the pictures.  They then show her some of

25   the pictures.  And even take steps to put post-its on to

179

1   minimize the trauma to her.  She then breaks down and cries

2   when they show her the pictures and has a reaction indicative

3   of somebody that is viewing their own victimization

4   memorialized in pictures that have been on the Internet.  So I

5   did not hear even the slightest shred of evidence presented

6   here today that should cause you to conclude that the officers'

7   conclusions that she was telling the truth were anything less

8   than totally reasonable.

9          I just want to sum this up in the sense of what

10  evidence of bad faith do you have coming from the officer.  It

11  certainly can't be evidence from expert witnesses that either

12  work for the Public Defender's office or are paid an expert fee

13  that they would have done things differently.  And the law does

14  not require law enforcement officers to conduct a perfect

15  examination or a perfect investigation.

16          THE COURT:  All right, thank you, Mr. Trabold.  Mr.

17  Patton, is there something you want to say in brief response?

18          MR. PATTON:  The misconduct is apparent as the nose

19  on anyone's face.  Getting a search warrant doesn't mean

20  anything if you withhold critical information from the judge.

21  It's the whole point of Franks_v._Delaware.  And the whole

22   point as to why Leon doesn't apply if there's a Franks'

23   violation.  Because the misconduct is not telling the judge oh,

24   by the way, here's some evidence that would obliterate my

25   argument for why there's probable cause in this case.  Whether

180

1   the police believe Tiffany's statement or not, I submit, means

2   nothing with regard to whether or not there is probable cause

3   to believe three-and-a-half years after Tiffany is saying these

4   pictures are taken of her, that the images are still on the

5   computer.  When Lynn knows that it's not the same computer.

6   Because she knows, she's already confirmed that the computer

7   George used to have was from the House of Television and that

8   that got returned and then re-rented to somebody else.  The

9   only way -- the fact that Tiffany said I just had a phone

10   conversation with the Eberles a couple days ago and they said

11   they wanted to make another videotape, if you even believe all

12   of that stuff, does not provide probable cause to say I can now

13   go search this person's computer because I now have probable

14   cause to believe they have child pornography on the computer.

15   Because they said they have sexual interest in children.  There

16  is no evidence of that.  I mean simply because somebody is

17  saying I have a sexual interest in children doesn't mean, okay,

18  you now have probable cause to go search their computer.

19        And what makes this case different from other

20  staleness cases where a law enforcement officer is saying hey,

21  we've been able to get through Internet records, ISP records,

22  that this person was logged on the Internet at this time and

23  downloaded child pornography onto their computer and even a lot

24  of time passes -- we still believe that this stuff is on the

25  computer.  What is different about this case is Detective Lynn


181


1  had gotten one of George's computers.  Now, this issue about

2  well, she would have told the magistrate or the district

3  justice well, the thing had been rebooted, so it may have been

4  deleted.  In the affidavit she gave to get the House of

5  Television computer, she knew that the computer had already

6  been reformatted.  And she still said I have probable cause to

7  believe these images are on the hard drive because I can get

8  that stuff with forensic software.  The government wants to

9  make it a perfect heads they win, tails we lose argument.  When

file:///A|/EBERLESP.TXT

10  we want to have probable cause, we say to the judge, don't

11  worry about the fact that these may be deleted because we can

12  use forensic software to recover them.  Then when they actually

13  get the computer, use the forensic software, don't find the

14  images or any child pornography, then they want to say, well,

15  that doesn't really mean anything because the thing got

16  reformatted.

17        And the opinions of the defense experts are relevant

18  on a couple of issues.  You had both of them, who have done

19  forensic work, who say, look, if you know you have Eberle's

20  hard drive and it had been only re-rented for nine days and it

21  had been just reformatted but not completely wiped, if you look

22  for these images and don't find them, the reasonable conclusion

23  to be drawn by a competent forensic examiner is these things

24  were never on the hard drive.  And once you reach that

25  conclusion, then Lynn has no basis of saying there is probable


182


1  cause to believe these images are on George's computer in March

2  of 2005.

3        THE COURT:  All right.  Thank you, Mr. Patton.

4          MR. HADLEY:  Your Honor, on the motion in limine,

5    rebuttal just briefly, if I may.  Just one quick sentence on

6    this.  In my brief I had all the statistics about how rampant

7    pornography is on the Internet.  The government cannot possibly

8    be allowed to make the leap that an interest in pornography is

9    the foundation for showing in interest in child pornography.

10   One's legal, one's illegal, there is absolutely no connection,

11   judge.  The motion in limine should be granted.  Thank you.

12          THE COURT:  Are we all set -- I apologize, were any

13   exhibits moved or need to be moved, just to clean our record up

14   here?

15          MR. PATTON:  Judge, I did not move Defendant's

16   Exhibit D, which is the records from the House of Television.

17          THE COURT:  Do you want to move those?

18          MR. PATTON:  I would move those.

19          THE COURT:  Exhibit D is admitted.  Was there

20   anything else identified that needs to be admitted?

21          MR. PATTON:  The search warrants have been referred

22   to, but they're attached to my motion.

23          THE COURT:  All right, they're admitted.  Thank you,

24   counsel, we'll get something out on this.

25          (Whereupon, at 3:00 p.m., the proceedings were


                                183


1   concluded.)

2

3                   - - -

4

5

6

7               C E R T I F I C A T E

8

9

10      I, Ronald J. Bench, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15

16

17   _____

18   Ronald J. Bench

19

20

21

22

23

24

25